# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-DP-00337-SCT

*QUINTEZ WREN HODGES*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/13/2001 |
| TRIAL JUDGE: | HON. JOHN M. MONTGOMERY |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL DEFENSE COUNSEL |
| | BY:  ANDRE DE GRUY |
| | CANDY LAWSON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: |
| | MELANIE KATHRYN DOTSON |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 03/10/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.    Quintez Wren Hodges appeals his capital murder conviction and sentence of death determined by a Lowndes County Circuit Court jury.  The jury returned a guilty verdict against Hodges, finding that he killed Isaac Johnson during the commission of a felony; therefore, Hodges committed capital murder pursuant to Miss. Code Ann. § 97-3-19(2)(e).  The jury also returned a guilty verdict against Hodges for the kidnaping of Cora Johnson.  After a sentencing hearing, the jury determined that Hodges should be given the penalty of death.  The trial court

entered judgment and sentenced Lynch to death by lethal injection. Hodges was also sentenced to a term of twenty years for the kidnaping conviction. The trial court denied Hodges' motion for a new trial, and he filed his notice of appeal with this Court.

## FACTS AND PROCEDURAL HISTORY

¶2. Hodges was born on October 14, 1980. In the summer of 1997, Hodges met thirteen year old Cora Johnson during a visit to play basketball with her brother, Isaac Johnson. Hodges and Cora began having a romantic relationship, and in late 1997 Cora became pregnant with Hodges' child. Their child was born on September 16, 1998.

¶3. Cora and Isaac Johnson lived with their mother, Bessie Tatum, in Lowndes County, Mississippi. Approximately four months into Hodges and Cora's relationship, Hodges began breaking into Cora's home without permission. Cora and her family repeatedly demanded that Hodges cease such actions. They contacted both the police and Hodges' mother in response to these repeated burglaries. Cora also warned Hodges that she would break up with him if he persisted in breaking into her home. However, Hodges continued to burglarize Cora's home, and she ended the relationship in January, 1998.

¶4. On one occasion in May of 1998, Cora came home to find that Hodges had, once again, burglarized her home. Cora and her mother found Hodges hiding under Cora's bed and immediately contacted the police, and Hodges was arrested. Hodges pled guilty to the burglary of Cora's home on November 17, 1998. During the time of this arrest and guilty plea, Hodges was also under indictment for three additional charges: breaking into a school, burglarizing the home of another female victim, and sexual assault of that victim. Pursuant to a plea bargain, Hodges plead guilty to the burglary of Cora's home and was sentenced to six months in the

Regimented Inmate Discipline program (hereinafter RID). The other charges were retired and placed on hold in the case files.

¶5. During his six months in the RID program, Hodges contacted Cora. Both Cora and her mother knew that their daughter needed a father figure and Cora informed Hodges that she wanted him to be a part of their daughter's life. During Hodges' term in the RID program, Cora sent various letters. In some letters, Cora admitted she still had feelings for Hodges and that she might consider reconciling if he would turn his life around and stop breaking into her home. In other letters she informed Hodges that he might not be the child's biological father and that she had a new boyfriend. However, Cora ultimately informed Hodges, both orally and in writing, that their romantic relationship was over.

¶6. Hodges was released from the RID program on June 29, 1999. Upon his release, Hodges immediately contacted Cora, and she arranged for Hodges to see his daughter. During this visit, Hodges ignored the child and spent the entire time making sexual advances toward Cora. Hodges became angry that Cora did not want to get back together. The weekend prior to the murder, Hodges was visiting his friend Anthony Betts. During this visit with Betts, Hodges had talked to Cora on the phone and later informed Betts that he was going to buy a gun and kill somebody with it. According to Betts, he did not take Hodges seriously because he knew him and figured he would not do something like that.

¶7. On the night of July 20, 1999, Isaac, Cora, the child and Harold Jackson (Cora's new boyfriend) were spending the evening at Cora's home. Hodges and Betts were visiting the home of Reginald Martin, who lived seven houses down from Cora. Between nine and ten p.m., Betts called Cora and asked if she would bring the child to Martin's house, so that Hodges

3

could visit with her. Cora refused and told Betts that she had company. Around midnight, Hodges called Cora and asked again if she could bring the child to Martin's house. They had a conversation, and Hodges kept telling Cora he was not going to let her get off the phone. Hodges was angry during the conversation, and Cora finally hung up the phone. According to Betts, when Cora finally ended the conversation, Hodges did not talk, he did not laugh, he just sat down. A couple hours later, Hodges left Martin's house and returned home.

¶8. Hodges went home and stole his mother's snubnosed, .32 caliber RG pistol and her gray Oldsmobile. Hodges then put on black shoes, black pants, back shirt, a beige ski mask and black gloves. He then took the gun and drove to Cora's neighborhood where he parked two houses down from Cora's house. Cora, in the meantime, sent Harold Jackson home and went to bed. Isaac was talking to his cousin on the phone when Cora went to bed. Around 2 a.m., Isaac told his cousin that he heard a noise in the back of the house, and he saw a shadow go across the hall. Isaac then called for Cora, thinking she was still awake and told his cousin that he would call him back.

¶9. At this point, what happened exactly is unknown. During the trial the State put forth testimony and evidence that the back door to Cora's house was locked and when Bessie Tatum left home at 9:30 p.m. the door was in perfect condition and had not been tampered with. Hodges had been told repeatedly that he was not invited into Cora's house and Hodges also knew that Cora did not want to see him. There was evidence of forced entry through the back door. The back door's lock had been jimmied. There were pry marks left on the back door and pieces of freshly scattered foam and weather stripping lying on the ground around the door frame. Mark Miley, a criminal investigator, testified that the foam and weather stripping was

4

fresh because the wind had not blown it away and it had not been walked upon. During the police investigation, a screwdriver, a knife and a pair of pliers were found on the entry table next to the back door.

¶10. After Isaac told his cousin that he would call him back, he went to investigate the noise and shadow. Isaac saw Hodges in his black clothes while holding a gun. Isaac was unarmed, and the family did not own a gun. Hodges informed the police that he thought Isaac was going for a gun but later conceded that he did not see Isaac with a gun. Hodges then shot Isaac once in the stomach. Isaac managed to move from the living room into his mother's bedroom where he collapsed and never got back up. As Isaac was going into his mother's bedroom, Hodges went to the take the other phone off the hook. According to Dr. Steven Hayne, Isaac was shot approximately ½ inch to the left of his mid-abdominal wall from a distance of 1 ½ to 2 feet away. As a result of the damage caused by the bullet, 2 ½ quarts of blood pooled within Isaac's abdominal cavity. According to Dr. Hayne, there were no signs of a struggle or fight and it took about 5 ½ to 10 minutes for the shock to set in and for Isaac to die. Dr. Hayne testified that the cause of death was homicide, caused by a gunshot wound to the abdomen.

¶11. After shooting Isaac, Hodges went to Cora's room where she had just awakened. According to Cora he came into her room telling her to get her stuff and that she was going with him. She told Hodges that she was not going anywhere with him so he struck her across the head with the gun. Cora then woke her daughter and prepared to leave with Hodges. Cora walked into her mother's bedroom and saw Isaac sitting in the dark, on the floor against the wall. Thinking that Isaac was hiding from Hodges, Cora whispered to him to call 911. At this time, Cora was unaware that Isaac had been shot. When Hodges saw Cora leaving her mother's

5

bedroom, he grabbed her and told her not to act stupid because he had a gun. Hodges then pushed Cora out the back door and took her to where he had parked the Oldsmobile. Holding the gun on Cora and her daughter, Hodges drove to Alabama. During the drive to Alabama, Hodges forced Cora to throw his ski mask out of the window. During the trial, the defense brought out the fact that Cora had ample opportunity to escape from Hodges if she really wanted to leave. However, Cora stated that she did not go because "he had a gun and he was probably going to shoot me and my daughter."

¶12. In the meantime, Hodges' mother, Johnnie Pearl Hodges, contacted the police, reporting that her car had been stolen. Around 3 p.m. Bessie Tatum called home to check on her children and discovered that the phone line was busy. She tried to call again and received another busy signal. She then rushed home to find Isaac dead and Cora and Annasheika missing. Bessie Tatum ran to her neighbor's home where she was informed that Hodges had been in the area. She then asked her neighbor to call 911. Johnnie Hodges also called Bessie Tatum and demanded to know where her son was. Bessie then told Johnnie Hodges that she had a child dead and two missing.

¶13. Once Hodges entered Alabama, he told Cora that he shot and killed her brother, Isaac. Cora testified that Hodges told her he came to her house that night to shoot her and her mother, Bessie Tatum, if she had been there. Cora also testified that Hodges said he thought Isaac was going to try to call 911 so he went to the living room and took the phone off the hook so that the call would not go through. According to Cora, Hodges threatened to kill her if she did anything stupid. Cora testified that during the trip to Alabama, Hodges forced her into the

6

back seat of the car, held a gun to her head and raped her while her daughter was lying in the front seat.

¶14. Cora then told Hodges that she did not care what he did to her as long as he took her daughter somewhere to get food and to be taken care of. Hodges then went back to Mississippi where he took Cora and the baby to his mother's house. When they arrived at his mother's house, Johnnie Hodges who knew of Isaac's death and Cora and her daughter's disappearance, asked Hodges what he had done. Cora told Johnnie Hodges that Hodges shot Isaac but Hodges quickly told her to shut up and remember his previous threat (to not act stupid because he had a gun). Hodges informed his family that the gun he used to kill Johnson was still in the car so Hodges' sister went to get the gun so that she could hide it. Hodges then left Cora and the baby at his mother's house, went to the police and confessed to killing Isaac and taking Cora and her daughter. However, Hodges denied raping Cora, stating that their sexual intercourse was voluntary. He also claimed that he shot Isaac because he thought Isaac was going to shoot him. However, he also conceded that he never saw Isaac with a gun.

¶15. While Hodges was at the police station, Greg Wright, an investigator with the Sheriff's Department, went to Hodges' house where he was told that Hodges had turned himself in. After talking to Cora he went inside and asked Johnnie Hodges for the gun that Hodges gave them. Johnnie Hodges took him outside to a small wood-framed house. Inside she took him into a room, reached under a pile of blankets and brought out a blue bag which held the gun that was used to shoot Isaac.

¶16. On November 8, 1999, Hodges was indicted for the capital murder of Isaac Johnson. He was charged with the underlying felony of burglary with the intent to commit an assault in

7

a dwelling. Hodges was also indicted for the kidnaping of Cora. On September 22, 1999, attorney Carrie Jourdan was appointed by the court as counsel for Hodges. Jourdan proceeded to defend Hodges by attending hearings, filing motions, procuring a mental examination for Hodges and conducting discovery in this case. After almost two years, on August 20, 2001, just twenty-one days before trial, Hodges fired Jourdan and retained private legal representation from Michael Miller, knowing that Miller had never tried a capital murder case. Four days after he was appointed, Miller filed for a continuance or in the alternative to withdraw as Hodges' counsel. He also filed a motion for time to prepare necessary defense motions. Miller also obtained the services of a criminal trial attorney, Guy Rogers, Jr., to assist him in Hodges' representation. After determining that Hodges had secured new counsel for the purpose of delaying the trial of his case, the court refused to grant any more continuances. The court found that even though Miller lacks the experience to try a capital murder case, he has obtained experienced co-counsel who has tried capital murder cases before.

¶17. On September 13, 2001, Hodges was convicted of capital murder of Isaac Johnson and the kidnaping of Cora Johnson. After the sentencing phase, which was held immediately after the trial, the jury returned a death sentence. Hodges was also sentenced to a term of twenty years for the kidnaping conviction. Hodges then moved for a new trial which was denied. The Mississippi Office of Capital Defense was substituted as counsel, and it now appeals to this Court raising the following claims:

    1.     Prosecutorial Misconduct Through Improper Cross Examination and the Introduction of False Evidence Deprived Qunitez Hodges of a Fundamentally Fair Trial and Mandates His Death Sentence Be Vacated.

8

2. The Prosecutor Committed Plain Reversible Error During Sentencing Closing Argument by Improper and Unfairly Prejudicial Comments and as a Result Hodges Was Denied a Fundamentally Fair Trial.

3. The Trial Court Erred in Admitting Highly Prejudicial and Inflammatory Testimony and Improper Evidence Concerning Hodges' Previous Criminal Charges at Sentencing, Contrary to the Provisions of Rules 403 and 404 of the MRE, and as a Result, Hodges Was Denied a Fundamentally Fair Trial.

4. Hodges Was Denied Effective Assistance of Counsel at All Stages of this Capital Murder Prosecution.

5. The Trial Court Erred in Failing to Accurately Instruct the Jury Regarding Hodges Ineligibility for Parole, Denying Hodges an Accurate and Reliable Sentencing Determination in Violation of Mississippi and Us Constitution.

6. The Capital Murder Indictment Was Flawed for Failure to Properly Charge the Offense and Denied Hodges an Opportunity to Properly Prepare a Defense.

7. The Death Sentence in this Case must Be Vacated Because the Indictment Failed to Charge a Death Penalty Eligible Offense.

8. The Trial Court Committed Reversible Error in Removing for Cause a Juror Qualified to Serve under Constitutional Standards.

9. The Trial Court Erred in Failing to Grant a Defense Requested Mistrial Following the Improper Introduction of Other Crimes, Wrongs or Acts Evidence in Violation of Rules 403 and 404 of the Mre, and Further, Erred in Failing to Admonish the Jury to Disregard Such Evidence, or in the Alternative, Erred in Failing to Charge the Trial Jury *Sua Sponte* with a Limiting Instruction.

10. The Trial Court Committed Plain Error by Allowing Introduction of Evidence of Other Crimes of Hodges in Violation of Rules 403 and 404 Without First Conducting a Proper Probative Value Versus Prejudicial Effect Analysis and Without Any Limiting/cautionary Instruction.

11. The Trial Court Erred in Allowing the Introduction of a Photo of the Deceased Where it Was Unnecessary to Establish a Disputed Fact and Was Highly Prejudicial, Denying Hodges Fair Trial.

12. The Trial Court Erred in Denying Defense Requested Lesser Offense Instruction on Manslaughter and Trespassing.

13. Hodges Conviction of Kidnaping Was Unsupported by the Evidence Adduced at Trial and Against the Overwhelming Weight of the Evidence Contrary to Relevant Mississippi Case Law.

14. The Trial Court Erred in Allowing the Jury to Consider the Unconstitutionally Duplicative Aggravating Circumstance of the Felony Burglary, Which Was Also Used to Elevate the Crime to Capital Murder.

15. The Trial Court Erred in Allowing the Jury to Consider the Invalid Aggravator of Avoiding Arrest, Which the Jury Used in Support of a Sentence of Death, Denying Hodges a Reliable Sentence as Guaranteed by the US and Mississippi Constitutions.

16. The Trial Court Erred in Sentencing Hodges to a Term of Years for Kidnaping, in Violation of Double Jeopardy Provisions of the US and Mississippi Constitutions.

17. The Trial Court Erred in Failing to Make a Complete Record of the Instructions of Law upon Which the Jurors Were to Rely in Determining Their Verdicts.

18. The Aggregate Error in this Case Requires Reversal of the Conviction and Death Sentence.

## STANDARD OF REVIEW

¶18. This Court reviews an appeal from a capital murder conviction and death sentence with "heightened scrutiny" under which all bona fide doubts are resolved in favor of the accused. *Simmons v. State*, 805 So. 2d 452, 472 (Miss. 2001) (citing *Porter v. State*, 732 So. 2d 899, 902 (Miss. 1999)). Further, this Court is cognizant of the fact that what may be harmless error in certain situations becomes reversible error where the penalty is death. *Id.*

10

## ANALYSIS

### 1. Prosecution Conduct.

¶19.    Hodges argues that the State, in conjunction with Assistant District Attorney Jim Kitchens, knowingly and willfully concocted a line of examination to demonstrate that Hodges received a lenient sentence recommendation for his prior burglary charge.   Hodges argues that the State improperly crossed Johnnie Hodges at the sentencing hearing regarding the prior burglary and that the State also improperly crossed Hodges about the same information. Hodges claims that the State did not have an evidentiary basis for these questions.    The pertinent parts of the cross of Ms. Hodges during the sentencing phase is as follows:

> Q.    Ms. Hodges, you testified that Ms. Tatum had said something that she had done everything she could to keep him out of the RID program; is that what you said?
>
> A.    That's what she said to me the day she found her son dead.  Yes, she did say that to me.
>
> Q.    But actually what happened was Ms. Tatum had told the defense counsel for your son back when he plead guilty back in November of 1998 that she did want him to go to the RID program, hadn't she?
>
> A.    You asked me was I there.   I was there.   All I know I heard the prosecuting attorney said that Ms. Tatum said she wanted Quintez to have seven years in the pen.
>
> . . .
>
> Q.    Isn't it true that Mr. Kitchens representing the State asked the judge, not this court but another judge, asked the judge to give your son 15 years in the penitentiary?  Isn't that what he asked him to do or do you recall?
>
> A.    I don't recall.  All I heard is seven years.
>
> Q.    And isn't it true that the information was provided to the Court by your son's lawyer that Ms. Tatum had requested that this defendant be sentenced instead to the RID program?
>
> A.    I didn't hear that either.
>
> Q.    Of course, Ms. Tatum would have been interceding on behalf of your son if that were true, is that not correct?
>
> A.    I don't know.  I didn't hear none of that.

The pertinent parts of the cross of Hodges during the sentencing phase is as follows:

Q. And you plead guilty to a charge of burglary of Ms. Tatum's house; is that right?

A. Yes, sir.

Q. And during the course of that plea process, at one point in time your lawyer stood up and told the judge that Ms. Tatum did not want you to go to the penitentiary, didn't he?

A. Not in my presence.

Q. You didn't see that?

A. No, sir.

Q. Isn't it true that also the Assistant District Attorney who was handling the case, Jim Kitchens, stood up and affirmed that that was so; that that was, in fact, what Ms. Tatum requested? Didn't he do that?

A. No, sir.

Q. You don't recall that happening at all?

A. No, sir.

Q. Do you recall that the State of Mississippi asked and sought that you be sent to the penitentiary for 15 years? Do you recall that?

A. I didn't know nothing about that.

Q. You didn't know nothing about that either. But you know that the judge in this instance agreed and thought it best to sentence you to the RID program to give you a chance; is that not correct?

A. Yes, sir.

Q. And he gave you a chance, didn't he?

A. Yes, sir.

Q. He gave you a big break, didn't he?

A. I ain't going to say it's a big break.

Q. You don't think that being charged by three indictments with three burglaries and one sexual assault battery getting to go to the RID program was a break? You don't think so?

A. Well, those charges was not proven.

¶20. In rebuttal the State called Assistant District Attorney Jim Kitchens, who participated in the prior burglary charge and plea hearing, to testify about the plea agreement and hearing. Hodges claims that the entire testimony of Assistant District Attorney Kitchens was false. Hodges claims that the falsity of the testimony is supported by comparing Kitchen's testimony with the court transcript of the plea hearing for the prior burglary. Hodges attaches this prior

12

plea hearing as an exhibit to his brief. However, the evidence that Hodges submits in support of this claim, consisting of the prior burglary plea hearing, is not contained in the trial record of the case sub judice. This Court has denied Hodges' motion to expand the record to include this information. Therefore, consideration of this evidence is barred. This Court has repeatedly held, "we will not consider matters which do not appear in the record and must confine ourselves to what actually appears in the record. Moreover, we cannot decide an issue based on assertions in the briefs alone; rather, issues must be proven by the record." *Medina v. State*, 688 So. 2d 727, 732 (Miss. 1996).

¶21. Hodges argues that according to *Branch v. State*, 882 So. 2d 36, 49 (Miss. 2004), this Court is allowed to consider such extraneous evidence not in the record. However, this Court in *Branch* clearly set forth that such appendices which were not part of the trial record were to be considered only on the *Atkins* and ineffective assistance of counsel issues. Here, during oral argument, defense counsel conceded that he was not pursuing this issue as ineffective assistance of counsel, but rather was doing so under the theory of prosecutorial misconduct. Also, this Court has recently amended Rule 22 of the Mississippi Rules of Appellate Procedure. Even though this amendment does not apply to the case sub judice, this Court holds that the plea hearing, which is not in the record, is barred from consideration and *Branch* does not allow this Court to consider such extraneous evidence. To make it clear what this Court can consider on direct appeal in future cases, Rule 22 has been amended to state that "[i]ssues which may be raised in post-conviction proceedings may also be raised on direct appeal *if such issues are based on facts fully apparent from the record.* M.R.A.P. 22 (emphasis added).

13

¶22. Furthermore, no objections were made during the cross of Johnnie Pearl Hodges or Hodges. Hodges is also procedurally barred because this issue was not raised at trial. *See Moawad v. State*, 531 So. 2d 632, 634 (Miss. 1988) (trial judge cannot be put in error on matter not presented for decision); *Walker v. State*, 823 So. 2d 557, 561 (Miss. Ct. App. 2002) (failure to raise issue at trial court level bars consideration at appellate level). Because this issue is raised in the direct appeal of a capital case, this Court will consider the merits of Hodges' argument without considering the extraneous evidence.

¶23. Hodges argues that the State did not have any evidentiary basis to ask those questions on cross. This Court has stated that it is inflammatory and extremely prejudicial for questioning without evidentiary basis. *Hosford v. State*, 525 So. 2d 789, 793 (Miss. 1988). However, the State did offer the testimony of Assistant District Attorney Jim Kitchens about the prior plea bargain. The State specifically asked Kitchens the same questions that were asked during the cross of Ms. Hodges and the defendant. The State produced the testimony that proved there was an evidentiary basis for the questions elicited during the cross of Ms. Hodges and the defendant.

¶24. Hodges also claims that all of Kitchens' testimony was false and that the knowing use of false evidence deprived Hodges of a fair trial and due process. To prevail on this due process claim, Hodges must show that "(1) the testimony was false, (2) the testimony was material to the verdict, and (3) the prosecutor knew or believed the testimony to be false." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (citing *United States v. Blackburn*, 9 F.3d 353, 357 (5th Cir. 1993)). Hodges has not proved these elements. He has not offered any proof that Kitchens' testimony was false, that it was material to the verdict or that the State

knew that it was false. Hodges, in his brief, claims that it is false but offers nothing to support this claim nor were there any objections to this testimony during the sentencing phase. Therefore, this issue is without merit.

### 2. Prosecutor's Closing Argument.

¶25. Hodges asserts that the State made inappropriate remarks in a portion of the closing argument at the sentencing phase by referring to the World Trade Center attacks, which occurred during the course of Hodges' trial, and Testament Biblical teachings. Hodges argues that these comments are plain error that affected the verdict and deprived Hodges of a fair and impartial trial. He claims that the State made these references to encourage the jurors to use the sentencing of Hodges as a way to vent their anger over the 9/11 attacks and to bring down the power of God.

¶26. The State correctly argues that none of these comments made in the closing were contemporaneously objected to and are therefore barred from consideration. *Simmons v. State*, 805 So. 2d 452, 489 (Miss. 2001). This Court has held that the failure by defense counsel to contemporaneously object to a prosecutor's remark at trial bars consideration of prosecutorial misconduct allegations on appeal. *Davis v. State*, 660 So. 2d 1228, 1255 (Miss. 1995). However, the rule governing preservation for review provides that if an appellant raises for review an issue not raised in the pleadings, transcript, or rulings, the appellant must have preserved the issue by raising it in a motion for new trial. Miss. Code Ann. § 9-13-31 (Rev. 2002); *Jackson v. State*, 423 So. 2d 129, 131 (Miss. 1982). The rationale for this rule is based on the policy of giving the trial judge, prior to appellate review, the opportunity to

consider the alleged error. *Howard v. State*, 507 So. 2d 58, 63 (Miss. 1987). Hodges did raise this issue in his motion for a new trial. Therefore, Hodges is not procedurally barred from raising this error on appeal.

¶27. This Court has stated that "although parties are given great latitude in closing arguments an improper closing argument may constitute reversible error if the natural and probable effect of the prosecuting attorney's . . . argument created unjust prejudice against the accused resulting in a decision inflated by prejudice." *Horne v. State*, 825 So. 2d 627, 640 (Miss. 2002) (citing *Dunaway v. State*, 551 So. 2d 162, 163 (Miss. 1989)). This Court has also said that "counsel may draw upon literature, history, science, religion, and philosophy for material for his argument." *Berry v. State*, 703 So. 2d 269, 281 (Miss. 1997).

¶28. Hodges contends that the following part of the State's closing argument compared him to terrorists, was improper, affected the verdict and deprived him of a fair and impartial trial:

> I think counsel said that in this particular situation that a killing for a killing doesn't necessarily show that killing is wrong. I would disagree. I think to do otherwise cheapens the value of life. Each and every one of you have had your own thoughts, for example, of the World Trade Center that's happened this week; and what have you thought about what should occur to those people who created that situation? You know what you thought and you know why you thought it. The reason you think that, ladies and gentlemen, is because there are some people who literally do not understand anything else. You know, when I was young I for a long time thought God was not fair, and I thought that because when you would read in Exodus about Moses and you would see where every time Pharaoh made his mind up to let the people go the Bible would say, And God hardened his heart. I thought that's not fair. How can somebody stand against God? How could Pharaoh justly be punished if God was the one hardening his heart? One day I was reading in Romans Chapter 9, if memory serves me correctly, and found these verses which were right on point because Paul says, What if God willing to show his power to the nation set up for himself vessels of wrath fit only for destruction? Ladies and gentlemen, there are those that walk among us that are vessels of wrath fit only for destruction.

16

However, "in order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remark, but must also take into account defense counsel's opening salvo." *Simmons v. State*, 805 So. 2d 452, 490 (Miss. 2001) (quoting *Edwards v. State*, 737 So. 2d 275, 299 (Miss. 1999)).   Therefore, we must also look to the defense's closing argument in order to make an appropriate assessment.   The defense counsel argued, in pertinent part,

> Ladies and gentlemen, what you're being asked to do when you are asked to impose the death penalty, I mean, you are really being asked to play God.   You are being asked to exercise the wisdom, the compassion, and to make a decision to put somebody to death and you're being asked to do that, and I know that in good conscious you will consider this decision.
> . . .
> This is not a case where somebody took an axe and hacked somebody to pieces.   This is not a case where a man went in and stabbed an 85 year old woman 55 times.   You know, there are cases out there like that.   Y'all read the paper.   Y'all watch TV.   You've seen it.   This is not that kind of case I submit.
> . . .
> You know, ladies and gentlemen, some of you might be of the persuasion, and I'm not trying to appeal to your religious convictions.   I really think that those things are private.   I think that your religious beliefs and I will submit to you those are your own, but there have been throughout criminal law religious themes have played a prominent role.   I mean, you probably know one of the most familiar one, An eye for an eye and a tooth for a tooth.   That is one that some people adhere to very strictly, you know.   You take an eye, you ought to give up your eye.   I would submit to you, ladies and gentlemen, that that's not going to help anything in our society by putting somebody to death.
> . . .
> If you sentence this man to death, I'd submit to the jury, ladies and gentlemen, it's going to rest on you.   I wouldn't want to go upstairs.   I believe in God.   Y'all don't have to.   It's a free country.   You can believe anything you want to.   I wouldn't put down anybody's views, but I wouldn't want to go up to my Maker knowing that part of my decision in the name of the State cause the death of a man.

¶29.   There is no merit to Hodges' argument.   With regard to the prosecutor's biblical reference, this Court has stated that counsel may draw religion material into his argument.

17

*Berry*, 703 So. 2d at 281. Defense counsel made use of Biblical references in his own closing arguments as well, which renders his position highly tenuous. Defense counsel, in the case sub judice, actually put the jury in the role of God. The comments by the State were in rebuttal to defense counsel's own use of biblical references. This Court has even upheld biblical references during closing argument where the prosecutor has quoted scriptures saying that the Bible justifies the death penalty. ***Doss v. State***, 709 So. 2d 369, 399-400 (Miss. 1996). When read in context with the defense's closing, the State's comments did not unfairly prejudice Hodges.

¶30.    With regard to the mention of the World Trade Towers, Hodges contends that the State impermissibly compared him to the terrorists. First of all, the defense counsel himself stated that this was not a case where somebody was hacked to death by an axe or stabbed 55 times. He also stated that the jury reads the papers, watches TV, has seen bad cases and that this was not that type of case. The State, in rebuttal, made one reference to the World Trade Towers. This Court has upheld much stronger arguments. For example, in ***Ahmand v. State***, 603 So. 2d 843, 846-47 (Miss. 1992), the prosecutor, during closing argument, made references to hostages and prisoners of war. This Court held:

> Remembering the wide latitude afforded prosecutors in closing arguments, the comments by the State when arguing for a conviction of Abdusabr Ahmad were not improper. Taken in context, the referral to prisoners of war was part of the free play of ideas, imagery, and personalities allowed in closing arguments. The referral to prisoners and hostages does not vilify Abdusabr Ahmad. It is a characterization of I.A.'s position on the day in question. It is not name-calling or a label on Abdusabr Ahmad's overall character. The State did not state that Abdusabr Ahmad was an Arab captor. The State did not even compare Abdusabr Ahmad to Arab captors. The State simply compared I.A.'s emotions to that of a prisoner of war or hostage.

*Id.* This is very similar to the case sub judice. The State did not compare Hodges to terrorists. Even if the State was comparing Hodges to terrorists, this Court has upheld instances where the State has compared the defendant to notorious criminals. For example, in ***Ballenger v. State***, 667 So. 2d 1242, 1269-70 (Miss. 1995)*,* the prosecutor compared the defendant's participation in the crime to that of Charles Manson. This Court held that "[c]onsidering the wide latitude given to attorney on closing arguments it can not be said that these comments were so improper as to require reversal." *Id.* at 1270. As was the case in ***Ballenger****,* the prosecutor here never called Hodges names or personally vilified him. Unlike ***Ballenger****,* Hodges' crime was not compared to that of a notorious criminal. In ***Wilcher v. State***, 697 So. 2d 1087, 1112 (Miss. 1997), this Court upheld the prosecutorial comment during closing in which they compared the defendant to a "mad dog". This Court said that the prosecutorial comment must be considered in context and the defense chose to use imagery to compare Wilcher to a rabbit and the State, in response, used imagery that it obviously found more appropriate and compared Wilcher to a "mad dog". *Id.*

¶31. Considering the wide latitude given to attorneys for closing arguments and considering the State's comment in reference to the defense's own closing, Hodges' arguments are without merit and there no unfair prejudice.

### 3. Evidence of Prior Criminal Charges.

¶32. Hodges claims that the trial court erred in allowing the prosecution, on cross-examination in the sentencing phase, to refer to Hodges' two escape charges and his previous arrest for the burglary of a school in 1997 and burglary and attempted sexual battery in 1998.

He asserts that this violates the Mississippi Rules of Evidence and Miss. Code Ann. § 99-19-101, as evidence of bad acts is not one of the eight enumerated aggravating factors admissible in capital sentencing trial and that they were not relevant to any of the statutory aggravating factors. Hodges also claims that during the testimony of Hodges the court erred when it received into evidence the actual indictment for the previous burglary and sexual battery charge. Hodges argues that the indictment itself could not be used for impeachment or rebuttal.

## A.    Admission of Prior Bad Acts During Cross-Examination

### 1. Cross-Examination of Lisa Hodges

¶33.    During direct examination, Hodges' sister, Lisa Hodges, testified that Hodges went to church and Sunday school and that he was a good kid that helped other people. She stated that Hodges did not fight and he obeyed his parents. She characterized him as being a nice, young boy growing up who had respect for his elders and was not violent towards other people. On cross-examination, the State sought to discredit this testimony. Hodges' sister was asked whether she knew that he had escaped from the jail twice and whether escaping from jail shows any respect. She stated that "no" it did not show respect for authority.

¶34.    The State argues that this asserted error is procedurally barred because defense counsel never raised these issues during the sentencing phase. During the cross-examination, the defense counsel did object to this line of questioning. However, their objection did not state that they were objecting because it was improper character evidence. The defense, when he objected, said "we are going to object to that testimony. That's nothing that's been revealed

20

anywhere." This Court has stated that when the objecting party does not state with some degree of certainty the ground on which the objection is made, and failure to articulate some other available ground acts as a waiver as to the unstated basis. *Materials Transp. Co. v. Newman,* 656 So. 2d 1199, 1203 (Miss. 1995). Failure of the defense counsel to articulate the ground upon which the objection is made, acts as a waiver. However, because this issue is raised in the direct appeal of a capital case, this Court will consider the merits of Hodges' argument.

¶35. The prosecution has no right to introduce evidence of wrongs and bad acts to prove Hodges' character or to show he acted in conformity therewith, unless it is competent rebuttal evidence in the face of the showing of Hodges' good character made on direct examination of this witness. *Hansen v. State,* 592 So. 2d 114, 148 (Miss. 1991) (citing *Simpson v. State,* 497 So. 2d 424, 428-29 (Miss. 1986); *Winters v. State,* 449 So. 2d 766, 771 (Miss. 1984)). M.R.E. 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The State questioned Hodges' sister about a prior bad act, the two attempts to escape jail. On direct examination, Hodges' sister testified that Hodges' character was good, that he respected his elders, did not disobey his parents, and that he was not a violent person and never fought. Her direct examination testimony opened the door to the State to ask these questions. There was testimony on direct that he was a good boy that respected his elders. The introduction of the two prior escapes from the jail was not error.

21

## 2. Cross-Examination of Chris Hodges

¶36. During direct examination Chris Hodges testified that Hodges was soft spoken, easy going, never fought, was never disruptive and he never defended himself. Chris stated that Hodges was the type of person who would avoid conflict. He stated that Hodges was a good person who would not have done this type of crime. Chris claimed that Hodges' troubles were the direct result of his relationship with Cora. Chris specifically testified that Hodges did not have problems with authorities prior to the time that he got arrested and charged with burglary. On cross-examination, the State sought to discredit this testimony. Chris stated that Hodges did not have problems with the authorities prior to his burglary of Cora's house. He also stated that his problems stemmed from his relationship with Cora. On cross the State asked whether he knew that Hodges was charged with burglary of a school and burglary of another house along with sexual battery, all of which happened prior to the burglary of Cora's house and had nothing to do with his relationship with Cora.

¶37. As stated previously, the prosecution has no right to introduce evidence of wrongs and bad acts to prove Hodges' character or to show he acted in conformity therewith, unless it is competent rebuttal evidence in the face of the showing of Hodges' good character made on direct examination of this witness. *Hansen,* 592 So. 2d at 148. On direct examination, Chris testified that Hodges' character was good and that he was not disruptive and not the kind of person to commit this crime. He also testified that Hodges did not have problems with the law prior to the charge of burglary of Cora's house and that the problems with the law stemmed from his relationship with Cora. This direct testimony opened the door to bring in the prior bad acts that occurred prior to the burglary of Cora's house and the bad acts that had nothing

22

to do with Cora. The introduction of these other burglaries and the sexual battery was not error.

### 3. Cross-Examination of Sharon Green

¶38. During direct examination, Sharon Green, Hodges' sister, testified that Hodges was never any trouble, was a normal child and never got into fights. On cross examination the State asked Sharon whether she was aware of the other difficulties he had, namely the burglary of the school, and the burglary and sexual assault of another victim. However, the defense never objected to these questions during the cross-examination. The law in Mississippi mandates that counsel must contemporaneously object to inadmissible evidence in order to preserve the error for appeal. *Rushing v. State*, 711 So. 2d 450, 453 (Miss. 1998); *Lester v. State*, 692 So. 2d 755, 795 (Miss. 1997). This rule is generally applied to situations in which no objection is made during trial and the issue is subsequently raised on appeal. *Crosswhite v. State*, 732 So. 2d 856, 861 (Miss. 1998). This is exactly what we have in the case sub judice. Defense counsel never objected to this evidence during the questioning and now they are raising it on appeal. This issue has been waived and was not preserved for appeal.

¶39. Procedural bar aside, this issue is without merit. As stated previously, the prosecution has no right to introduce evidence of wrongs and bad acts to prove Hodges' character or to show he acted in conformity therewith, unless it is competent rebuttal evidence in the face of the showing of Hodges' good character made on direct examination of this witness. *Hansen*, 592 So. 2d at 148. Her direct examination testimony opened the door to the State to ask these questions regarding Hodges' previous crimes. Furthermore, this evidence was already placed before the jury during the cross of Chris Hodges.

23

### B.  Statutory Aggravating Factors and Prior Bad Acts

¶40.    Hodges also argues that the admission of these prior bad acts were prohibited, since they were not relevant to any of the statutory aggravating factors enumerated in Miss. Code Ann. § 99-19-101(5).   Hodges alleges that the State is only allowed to offer evidence that is relevant to the statutory aggravating circumstances.   However, Miss. Code Ann. § 99-19-101(1) provides that at the sentencing hearing "evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances."   This Court has stated that the statute "does not limit the evidence that can be presented at the sentencing phase to evidence relevant to the aggravating circumstances." *West v. State*, 820 So. 2d 668, 670 (Miss. 2001).   As discussed above, these prior bad acts were introduced when the defense opened the door to Hodges' character.   Since § 99-19-101(1) allows any evidence that the court deems relevant to sentence and because these acts were relevant to rebut the direct testimony of Hodges' character, this assignment of error is without merit.   This Court has also held that "[t]he State is allowed to rebut mitigating evidence through cross-examination, introduction of rebuttal evidence or by argument." *Wiley v. State,* 750 So. 2d 1193, 1202 (Miss. 2000) (quoting *Turner v. State,* 732 So. 2d at 950).   As stated previously, these prior bad acts were admissible as proper rebuttal evidence.   Therefore, this issue is without merit.

### C.  The Introduction of the Actual Indictment During Cross-Examination of the Defendant

¶41.    Hodges also claims that the trial court erred when it received into evidence the actual indictment for the previous burglary and sexual battery charge.   Hodges argues that the

24

indictment itself could not be used for impeachment or rebuttal and that its use violates with the rules of evidence.

¶42.     On direct examination, during the sentencing phase, Hodges was asked "it's true that in the past you've been charged with some other crimes, isn't it?"   Hodges answered this question saying that he had only been charged with one other crime, which was the burglary of Cora's house.   Hodges testified that he was charged with that one other crime and he served his time in the RID program.   On cross-examination, the State asked "you testified that you were charged only with one charge; is that correct?"   Hodges again said that he had only been charged with one crime.   The State then asked Hodges whether he recalled the other three crimes, the burglary of the school and the burglary and sexual assault of another female victim. Hodges said that he did not recall the three other crimes.   The State then handed Hodges a copy of the indictment which showed one of the crimes and Hodges said that he did not recognize it.   The State then showed Hodges another indictment which showed the burglary of the other victim's house and the attempted sexual battery of the other victim.   Hodges then admitted that he was charged with these other crimes.   The State moved to introduce these indictments into evidence in which the Court allowed.   Hodges did not object to the introduction of these indictments.

¶43.   "If no contemporaneous objection is made, the error, if any, is waived."   *Walker v. State,* 671 So. 2d 581, 597 (Miss. 1995) (citing *Foster v. State,* 639 So. 2d at 1270). Since Hodges never objected to the introduction of these indictments, the issue is procedurally barred. Procedural bar aside, this issue is without merit.

25

¶44.    Mississippi Rule of Evidence 608 provides in part:

> **(b) Specific Instances of Conduct.**   Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence.

This Court has held that "specific instances of conduct under our Rules of Evidence may not be proved by extrinsic evidence for impeachment purposes; they may only be inquired about on cross-examination." *Jackson v. State*, 645 So. 2d 921, 923 (Miss. 1994) (citing M.R.E. 609 & *Lewis v. State*, 580 So. 2d 1279, 1287 (Miss. 1991) (emphasis omitted)).   In *Jackson*, the State attempted to impeach a defense witness with extrinsic evidence of specific instances of that witness' conduct.   645 So. 2d at 923.   This Court held that "such attempts at impeachment are clearly forbidden by Rule 608(b)."   *Id.* at 923-24.   However, in *Jackson*, this Court held that the rule violation did not rise above harmless error.   *Id.* at 924.   "We are not required to reverse a case based solely upon the showing of an error in evidentiary ruling.   A denial of a substantial right of the defendant must have been affected by the evidentiary ruling . . ."  *Id.* (citing *Newsom v. State*, 629 So. 2d 611, 612 (Miss. 1993)).

¶45.    Although the introduction of the indictment was improper impeachment evidence, such error was harmless.   The jury, on many previous occasions throughout the sentencing phase, heard testimony regarding these other crimes.   Hodges was not denied a substantial right by the introduction of this indictment.

¶46.    The State argues that the introduction of this indictment was not improper because it was used to rebut Hodges' inferences and direct statements that his prior criminal history was

insignificant.   Indeed, this Court has held that "[t]he State is allowed to rebut mitigating evidence through cross-examination, introduction of rebuttal evidence or by argument." *Wiley v. State,* 750 So. 2d 1193, 1202 (Miss. 2000) (quoting *Turner v. State,* 732 So. 2d at 950).

¶47.   Notwithstanding the procedural bar, this issue is without merit.

### 4. Assistance of Counsel.

¶48.   Hodges alleges that he was denied effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984), during all stages of his trial.   The State challenges Hodges' exhibits which were not part of the trial record.   According to the State such exhibits are barred from consideration.   However, this Court in *Branch v. State*, 882 So. 2d 36, 49 (Miss. 2004), noted that M.R.A.P. 22 (b) states that

> [i]ssues which may be considered in post-conviction proceedings may also be raised on direct appeal.   Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute waiver barring consideration of the issues in post-conviction proceedings.

Here Hodges was represented by Carrie Jourdan for two years.   Twenty-one days prior to trial, Hodges replaced Jourdan for Michael Miller.   The Office of Capital Defense Counsel was appointed for this direct appeal.   "If new counsel on direct appeal is required to assert collateral claims, there must be an opportunity to submit extraneous facts and discovery and evidentiary hearing to develop and prove the allegations." *Id.   See also Brown v. State*, 798 So. 2d 481, 491 (Miss. 2001) (citing *Smith v. State*, 477 So. 2d 191, 195 (Miss. 1985) and

*Turner v. State*, 590 So. 2d 871, 874 (Miss. 1991)). In **Branch**, this Court went on to explain

that

> there is conflicting authority on whether this Court should apply the procedural
> bar in a post-conviction relief case raising ineffective assistance of counsel on
> direct appeal. *Goodin v. State*, 856 So. 2d 267, 279 (Miss. 2003). Goodin was
> then permitted to proceed on the issue of ineffective assistance of counsel and
> was granted an evidentiary hearing to determine whether he was mentally
> retarded within the meaning of *Atkins*. Although this case is a direct appeal,
> Branch is represented by counsel who did not represent him in the trial court.
> Branch must raise *Atkins* and ineffective assistance of counsel issues in this
> direct appeal or he will be barred from doing so in subsequent appeals.
> Therefore, we will permit Branch to proceed with these issues, and we will
> consider the additional documents supplied in Appendices to Original Brief of
> Appellant.

882 So. 2d at 49. Therefore, this Court will consider the exhibits attached to Hodges' brief,

which were not part of the record.

¶49. The ineffective assistance of counsel issue will be addressed in two parts: the

culpability phase and the penalty phase. The standard for evaluating an ineffective assistance

of counsel claim is well settled:

> Where ineffective assistance of counsel is alleged, "the benchmark [ ] must be
> whether counsel's conduct so undermined the proper functioning of the
> adversarial process that the trial cannot be relied on as having produced a just
> result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064,
> 80 L. Ed. 2d 674 (1984). In addition, the defendant must show that the
> counsel's performance was deficient and that the deficiency prejudiced the
> defense of the case. *Id.* at 687, 104 S. Ct. 2052. In order to show prejudice
> under the Strickland standard, the [defendant] must show "that there is a
> reasonable probability that, but for counsel's unprofessional errors, the result
> of the proceeding would have been different. A reasonable probability is a
> probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104
> S. Ct. at 2068. A defendant must make both showings under Strickland,
> otherwise, "it cannot be said that the conviction or death sentence resulted from
> a breakdown in the adversary process that renders the result unreliable." *Jones*

*v. State*, 857 So. 2d 740, 745 (Miss. 2003) (quoting *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984)).

*Branch*, 882 So. 2d at 51-52 (citing *Harris v. State*, 861 So. 2d 1003, 1018 (Miss. 2003)). Trial counsel is presumed competent, and the burden of proving that counsel's performance was deficient and prejudicial falls upon the appellant. *Hansen v. State*, 649 So. 2d 1256, 1258 (Miss. 1994). There is no constitutional right then to errorless counsel. *Stack v. State*, 860 So. 2d 687, 696 (Miss. 2003); *Cabello v. State*, 524 So. 2d 313, 315 (Miss. 1988); *Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991) (right to effective counsel does not entitle defendant to have an attorney who makes no mistakes at trial; defendant just has right to have competent counsel).

¶50.    During trial counsel must make strategic discretionary decisions including whether or not to file certain motions, call certain witnesses, ask certain questions, or make certain objections. *Cole v. State*, 666 So. 2d 767, 777 (Miss. 1995). In gauging counsel's performance, we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984) (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

### A.    Culpability Phase

¶51.    During the culpability phase, Hodges contends that he received ineffective assistance of counsel by his counsel's: (1) failure to present evidence in support of the motion to suppress an unconstitutional confession; (2) failure to investigate critical prosecution

29

witnesses and to confront those witnesses; and (3) failure to know the law applicable to this case and to properly advise Hodges regarding plea bargaining. Each sub-issue will be discussed separately.

### 1. Evidence in support of motion to suppress confession

¶52. Hodges claims that he was coerced into giving the confession and the defense counsel rendered ineffective assistance of counsel in failing to present evidence to support this claim and to impeach the law enforcement witness. Hodges claims that the officer made promises to him before the confession which made him give the statement and that he was not advised of his right to an attorney. It is clear from the record that Hodges was informed of his *Miranda* rights which included his right to an attorney and the rights form that Hodges signed was introduced as evidence during the trial.

¶53. After fleeing to Alabama, Hodges returned to Mississippi and went to his mother's house. While at his mother's house and before the police arrived Hodges voluntarily turned himself in at the sheriff's department. Before talking to Hodges, Kevin Pitre, an officer with the Lowndes County Sheriff's office, took out the standard rights form, read it to Hodges, gave it to him to read, and then asked him if he understood it or had any questions before he signed the form. Hodges read the form and signed it. Pitre testified that Hodges never indicated that he had problems reading or understanding the contents on the form. Furthermore, there was a space on the form entitled "problems reading and writing" and the answer to that was "none." Hodges advised Pitre that he understood the form, wished to sign it and to make a statement.

¶54.    Hodges was then taken to the interview room where Pitre and Joe Young proceeded with the interview.    The statement was videotaped, and Hodges started telling them what had happened.    After Hodges was finished, Young asked Hodges to tell them again what had happened and during the second time Young personally wrote the statement out as Hodges was talking.    After Young wrote out the statement he gave it to Hodges, told him to read it and if there was something he did not understand or something that needed changing to let him know. Hodges then read the statement, initialed each page and signed it at the bottom.

¶55.    During the hearing on the motion to suppress the confession, Pitre testified that Hodges was not intimidated or coerced in any way.    Pitre also testified that he did not offer any rewards, promises or inducements.    During cross-examination he was asked whether he told Hodges that he would recommend a lesser sentence if he gave the statement.    Pitre testified that he did not tell Hodges that he would recommend a lesser sentence or that he would get a lesser sentence.    In this appeal, Hodges has submitted an affidavit of Michael Miller, his trial attorney.    In this affidavit Miller states that Hodges told him that the detectives said that he was going to be charged with manslaughter.    Hodges also submits the transcript of the preliminary hearing and claims that Pitre's testimony was inconsistent.    Hodges claims that during the preliminary hearing Pitre testified that Hodges asked him what would be the sentence if he was convicted for capital murder and then during the suppression hearing Pitre said that Hodges did not ask any questions.

¶56.    To succeed on this claim of ineffective assistance of counsel, Hodges must first show that counsel's performance was deficient.    Hodges argues that defense counsel was ineffective for failing to confront Pitre with his inconsistent testimony and by failing to introduce the only

31

evidence in support of their motion, which was that Pitre told Hodges he would recommend a lesser sentence of manslaughter if he gave a statement.

¶57.   The first claim that Hodges raises was that his counsel was deficient because he failed to confront Pitre with the inconsistent statement.   The following is the relevant part of the testimony of Pitre during the preliminary hearing:

> When questioning him, he asked what would be the sentence for this if he was convicted for capital murder for killing Isaac.   He was advised of basically what the state statute states the sentence could be.   The maximum sentence could carry a death penalty.
> When he was advised of that, he advised . . . Well, it could carry the death penalty or life in prison.   It could carry either one.   At the time he was advised of that, he said he would prefer to be just put to death.   He said he didn't want to spend the rest of his life in prison.

The relevant parts of Pitre's cross-examination during the hearing on the motion to suppress that Hodges claims is inconsistent with the above is as follows:

> Q.   Earlier you testified that if there were rights that he did not understand that you would explain them to him.   Which rights did he not understand on that form where you would put a check mark by all of them?
> A.   As I would read off the rights on each line, I would check it off as I would read it to him, and when I handed him the paper I asked him to read it.   I said, If any of this you don't understand or have a question with, let me know.   He advised he understood and *he didn't have a question* prior to signing the statement, the rights form.
> Q.   He didn't have any question?
> A.   No, sir.   He indicated he *didn't have a question* or didn't have a problem with the rights.
> Q.   Officer Pitre, are you telling the Court that you said nothing to him regarding any lesser sentence or any recommendation you would make to him if he gave a statement to you?
> A.   No, sir, I didn't say nothing to him.
> Q.   Nothing whatsoever?
> A.   No, sir.

(emphasis added). Pitre did not give inconsistent testimony. During the preliminary hearing Pitre stated that while they were questioning Hodges, he asked what the sentence would be if convicted of capital murder. During the motion to suppress, Pitre testified that Hodges had no questions prior to signing the rights form. The question about the sentencing that Hodges asked was during the actual questioning. During the motion to suppress, Pitre was referring to whether Hodges had any questions before he signed the rights form which was before the actual questioning. These were two very distinct points in time. Since Pitre did not make an inconsistent statement, defense counsel was not deficient. "Failure to raise meritless objections is not ineffective lawyering." *Brown v. State*, 798 So. 2d 481, 494 (Miss. 2001) (citing *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)).

¶58. The second instance Hodges claims was ineffective was the failure to introduce the fact that Pitre allegedly told Hodges that if he made a statement he would recommend manslaughter. The only evidence Hodges submits in support of this argument is an affidavit from his trial attorney, Miller. In the affidavit Miller says that Hodges told him that he believed he had been tricked into giving the statement to the police and that the detective told him that he was going to be charged with manslaughter. The only way to introduce this information was to put Hodges on the stand during suppression hearing. There is nothing in the record that explains why Hodges' counsel did not put Hodges on the stand during the suppression hearing. His decision to keep Hodges off the stand during the suppression hearing may have been a deliberate trial strategy. This Court cannot second guess Hodges' attorney. *See Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991). When evaluating the overall performance of counsel, counsel must make strategic discretionary decisions including

33

whether or not to file certain motions, call certain witnesses, ask certain questions, or make certain objections. *Cole v. State*, 666 So. 2d 767, 777 (Miss. 1995). There is also a strong presumption that the attorney's performance was within the wide range of reasonable, professional, and acceptable conduct. *Leatherwood v. State*, 473 So. 2d 964, 968 (Miss. 1985).

¶59. Furthermore, Hodges was not arrested on suspicion of the murder. Hodges voluntarily went to the police station, turned himself in and told the officers he wanted to make a statement. He went to the police station by himself to tell the police what had happened. Hodges was also informed of his right to testify during this hearing and Hodges elected not to testify. There is no evidence that Hodges was coerced into giving the confession when the sole reason he voluntarily went to the police was to give the statement and to tell the police what he had done. Defense counsel was not deficient for failing to introduce this information.

¶60. This Court holds that the first prong of *Strickland* was not met. Since Hodges' attorney's performance on this issue was not deficient, it is unnecessary to address the second prong of *Strickland*.

### 2. Investigate and confront critical prosecution witnesses

¶61. Hodges claims that counsel was ineffective for failing to investigate a critical prosecution witness which would have provided impeachment evidence. Hodges claims that the prosecution witness, Anthony Betts, was a critical witness in supplying evidence concerning Hodges' alleged intent to assault and if defense counsel would have checked with the Lowndes County Circuit Clerk he would have discovered compelling impeachment evidence against Betts. Hodges argues that if the jury had known that Betts was a convicted

34

felon and on probation at the time of his testimony they could have chosen to reject his testimony. In support of this claim, Hodges submits the sentencing order which recites that Betts pled guilty to burglary and was sentenced to the RID program. Hodges also submits an order which suspended Betts' seven-year term at the completion of the RID program and placed him on probation for five years.

¶62. It has been recognized that adequate investigation is a requisite of effective assistance. *Gray v. Lucas*, 677 F.2d 1086, 1093 (5th Cir. 1982). *See Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003); *Rummel v. Estelle*, 590 F.2d 103, 104 (5th Cir. 1979) (per curiam); *Gaines v. Hopper*, 575 F.2d 1147 (5th Cir. 1978) (per curiam). To establish a constitutional violation, a defendant must show both a failure to investigate adequately and prejudice arising from that failure. *Id. See Washington v. Watkins*, 655 F.2d 1346, 1362 (5th Cir. 1981). Even assuming that Miller failed to make an adequate investigation, there is no prejudice arising from this failure. The defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

¶63. Anthony Betts testified that he had known Hodges for about three years. Betts also stated that the weekend before the shooting Hodges told him that he was going to buy a gun and kill somebody with it. Betts then said that he did not take Hodges seriously because he knew he would never do anything like that. Betts then testified that on the night of the murder Hodges was at his house and had talked to Cora on the phone. Betts testified that after talking to Cora on the phone Hodges just sat there for about an hour and then left. On cross Betts testified that after Hodges left his house he did not know where Hodges went or what happened

35

after Hodges left his house. Excluding this testimony, there was still ample evidence of Hodges' guilt.

¶64. Hodges argues that Betts was a crucial witness in supplying evidence concerning Hodges' alleged intent to assault. The only testimony Betts offered that may have been helpful to the State was the fact that Hodges told him a week before the shooting that he was going to buy a gun and shoot somebody. However, this did not show that Hodges, a week later, went to Cora's house with the intent to kill someone. Betts even stated that he knew Hodges would never do anything like that and that he had no idea what happened that night. There was ample evidence other than Betts' testimony that Hodges committed burglary with the intent to assault. In his confession, Hodges told the police that he broke into Cora's house. In his confession he said that he parked two houses down, walked around the house a couple of times, went to the back door and went inside the house. There was also evidence of forced entry through the back door. Cora also testified that Hodges told her that he came to her house that night to shoot her or her mother, if she had been there. Cora also testified that Hodges entered her house uninvited wearing black clothes, gloves, a ski mask and carrying a gun. The underlying felony of burglary with intent to commit assault was established without Betts' testimony. Hodges has not shown any prejudice for the failure to adequately investigate. Hodges argues in his brief that had the jury been "informed that Betts was a convicted felon on probation at the time of his testimony and that he had gotten special treatment on sentencing for that offense,[1] they very well could have completely rejected his testimony." As stated previously,

---

[1]There is absolutely no evidence that Betts received any special treatment. Betts pled guilty to burglary. At the time of the burglary, Betts was a juvenile and this was his first offense. He was sentenced to 7 years suspended and went to the RID program. After

36

absent Betts' testimony, there was ample evidence in the record.  This issue is without merit.

### 3. Properly advise on plea bargain and applicable law

¶65.    Hodges claims his counsel was ineffective for failing to properly advise him of the sentencing possibilities.    Hodges claims that this deprived him of any real opportunity to consider the plea offer made by the prosecution.  In support of this claim, Hodges submits an affidavit which he states that Miller told him that if he were found guilty of murder he could be sentenced to life with parole, life without parole, or death.    In the affidavit, Hodges also states that Miller told him the State made a plea bargain of life without parole and if he had know that life with parole was not an option he would have taken the plea bargain.  He states that he turned down the offer "because I wanted to take my chances of getting a life with parole sentence."

¶66.    Hodges has not established prejudice with respect to this failure to properly advise. Hodges cannot prove that but for his attorney's errors, he would have accepted the plea offer and he cites no evidence to indicate that prior to his conviction he expressed any desire to plead guilty.  Hodges argues that he would have received a lesser sentence had he accepted the plea agreement.    The Eleventh Circuit has held that "given appellant's awareness of the plea offer, his after the fact testimony concerning his desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, he would have accepted the plea

---

completion of RID he was placed on probation for 5 years.  Hodges argues that for his previous burglary he was sentenced to 15 years suspended and went to the RID program and since that was more harsh than Betts' sentence, he must have gotten some leniency. However, that was not Hodges' first offense.

offer." ***Diaz v. United States***, 930 F.2d 832, 835 (11th Cir. 1991) (citing ***Johnson v. Duckworth***, 793 F.2d 898, 902 (7th Cir. 1986)). Hodges has not shown or established any facts that, if proven, would entitle him to relief. All Hodges submits is his affidavit, after the fact, that he would have accepted the offer but for counsel's failure to properly advise. This Court holds that this alone is "insufficient to establish that but for counsel's alleged [failure to properly advise], he would have accepted the plea offer." ***Id.*** Therefore, this issue is without merit.

### B. Penalty Phase

¶67. Hodges contends that he received ineffective assistance of counsel during the penalty phase by: (1) counsel's failure to present available evidence in mitigation; (2) the trial court's denial of an overnight recess before closing argument; and (3) counsel's failure to properly prepare Hodges for his testimony. Each sub-issue will be discussed separately.

### 1. Mitigation Evidence

¶68. Hodges claims that counsel failed to present available evidence in mitigation and that he was prejudiced by counsel's failure to request subpoenas for his sister, cousin, an expert witness from the State Hospital at Whitfield and to adequately confront Johnny Robbins, a prosecution witness. In support of this claim, Hodges submits an affidavit from Miller, his trial attorney, which states that since he had only a week to prepare for the trial he did not focus on what mitigation witnesses would testify. However, Hodges fails to note that he fired his court appointed attorney 21 days before trial and then hired Miller. Hodges also submits the medical report from Whitfield, which was also contained in the record.

### a. Expert witness from State Hospital

¶69. The first claim Hodges raises is that counsel was ineffective for failing to subpoena an expert witness from the state hospital. The State Hospital evaluated Hodges before trial and was asked to render an opinion on possible mitigating circumstances. Hodges argues that defense counsel took the position that the report was not helpful when in fact it supported several mitigating factors such as his limited education, his difficult relationship with Cora and drug use. He also argues that the expert could have given an explanation of the escapes from jail which was already before the jury. He also argues that the expert could have explained the mitigating circumstance of his age and how the adolescent brain functions different than the adult brain. Hodges argues that this evidence would have provided an explanation of why adolescents are more impulsive than adults. However, Hodges fails to point out that at the time of the murder, he was nineteen years old (legally an adult). Hodges now asserts that more could have been done but he fails to explain how this report would serve to persuade a jury to leniency in sentencing.

¶70. The Supreme Court has stated that

> *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the "constitutionally protected independence of counsel" at the heart of *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. We base our conclusion on the much more limited principle that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." *Id.* at 690-691, 104 S. Ct. 2052. A decision not to investigate thus "must be directly assessed for reasonableness in all the circumstances." *Id.* at 691, 104 S. Ct. 2052.

*Wiggins v. Smith,* 539 U.S. at 533, 123 S. Ct. at 2541. In the case sub judice, trial counsel investigated the medical report. Trial counsel even talked to the expert witness at Whitfield and discussed the possibility of his testifying at the sentencing phase. Trial counsel gave the doctor a copy of the letters that Cora had sent Hodges and asked the doctor to examine the letters. Trial counsel specifically asked the doctor to examine these letters to determine if the letters changed his opinion on the mitigating factors. This additional information did not change the doctor's opinion and the decision not to call this doctor reflected reasonable professional judgment.

¶71. Furthermore, to determine prejudice it is required to compare the evidence actually presented at sentencing with all the mitigating evidence Hodges now submits. *Neal v. Puckett*, 286 F.3d 230, 241 (5th Cir. 2002). "Stated to the point: Is this additional mitigation evidence so compelling that there is a reasonable probability at least one juror could reasonably have determine that, because of [this additional evidence], death was not an appropriate sentence?" *Id.*

¶72. During the sentencing phase, Hodges had five witnesses testify as to mitigating circumstances. The first witness was Lisa Hodges, his older sister. She testified that she helped raise Hodges and that Hodges went to church, was a good kid, helped others, did not get into fights and obeyed his elders. She also testified that Hodges was not a violent person. The second witness was Raneece Hodges, his niece. She testified that she grew up with Hodges because they were about the same age. She said that he would always obey his mother and that he was a mama's boy. She also testified that he had troubles at school when he transferred to Caledonia High. The third witness during sentencing was Chris Hodges, his uncle. He testified

40

that Hodges was soft-spoken, did not fight and when teased he would always avoid conflict. The fourth witness was Sharon Green, another sister. She also testified that she helped raise Hodges and he did not fight and he always clung to his mother. The last witness to testify during sentencing was Hodges' mother, Johnnie Pearl Hodges. She testified that Hodges was a sickly boy growing up because of his asthma. She said that he never got into trouble as a little boy. However, she testified that he started having trouble in school later on and was expelled at Caledonia High and later dropped out of school. She testified that he did not have a close relationship with his father and his trouble began when he started dating Cora. The State presented four aggravating factors for the jury to consider: (1) capital murder was committed during the commission of the crime of burglary; (2) capital murder was committed during the commission of the crime of kidnaping; (3) capital murder was committed by one who was already under a sentence of imprisonment; and (4) capital murder was committed for the purpose to avoid a lawful arrest.

¶73. The additional mitigating evidence that Hodges claims the Whitfield expert could have testified to was the fact of his limited education, his difficult relationship with Cora and drug use. He also argues that the expert could have given an explanation of the escapes from jail which was already before the jury. He also argues that the expert could have explained the mitigating circumstance of his age and how the adolescent brain functions differently than the adult brain. Hodges argues that this evidence would have provided an explanation of why adolescents are more impulsive than adults. It is hard to say that the result of the proceeding would have been different with this additional evidence. First of all, the fact that he had a limited education was already before the jury. Hodges' mother testified to the fact that he quit

41

school and did not graduate and did not finish his GED courses. His mother also testified that his troubles began when he started seeing Cora, so the evidence of the difficult relationship with Cora was already before the jury. Hodges also testified during the sentencing phase and he had an opportunity to testify about his difficult relationship with Cora and his drug use. He could have also explained why he escaped from jail. When asked during cross-examination Hodges stated that he did not remember why he escaped from jail. Also the fact that adolescents are more impulsive than adults does not affect the outcome because Hodges was nineteen when he committed capital murder. The only additional evidence that was clearly not before the jury was the drug use. When comparing this with all the evidence that was presented, no prejudice occurred. This additional mitigation evidence of drug use is not so compelling that there is a reasonable probability at least one juror could reasonably have determine that death was not an appropriate sentence. Thus, had this witness been called to testify, there is not a reasonable probability that the result would have been different. This issue is without merit.

### b. Additional mitigation witnesses

¶74. Hodges also claims that counsel was ineffective for failing to subpoena Hodges' sister and cousin, which would have provided compelling mitigation evidence. Hodges claims that his sister, Joann Latz, would have testified that Hodges was teased as a child and that she would have offered the only evidence of the lack of father/son relationship. Hodges also claims that she could have augmented the testimony of a change in his behavior as he entered his teen years and could have painted an accurate picture of the mother/son relationship that was never explored.

42

¶75. The facts here suggest that any additional character witnesses would have been cumulative. Defense counsel offered the testimony of five character witnesses during sentencing. Chris Hodges already testified that they teased him as a kid and he would avoid conflict. Johnnie Hodges testified that Hodges did not have a relationship with his father. The fact that his behavior changed and that he started having trouble in school was offered by at least two of the witnesses. While each of these two additional witnesses might have been willing to testify, none of them brought unique information to be considered about Hodges' behavior. The additional testimony would have merely echoed that which was already offered at mitigation. In *Wiley v. State*, 842 So. 2d 1280, 1286 (Miss. 2003), this Court held that "the record reflects that evidence of all of the mitigating factors Wiley alludes to was introduced during the sentencing trial by other witnesses and that there was no need for cumulative testimony." This is exactly the situation we have in the case sub judice. All of the additional testimony Hodges alludes to was introduced during the sentencing trial by other witnesses. Thus, her testimony would have been cumulative.

¶76. Therefore, this additional evidence is not of a nature to cast any doubt as to the propriety of the jury's verdict and, as a result, this claim is without merit.

### c. Victim impact statement

¶77. Hodges also claims that defense counsel was ineffective in failing to introduce the victim impact statement of Bessie Tatum, the mother of Isaac and Cora Johnson. Hodges argues that the jury was left with the impression that Mrs. Tatum wanted to see Hodges put to death when the victim impact statement said that her preference was life in prison.

43

¶78. Defense counsel's decision not to introduce the victim impact statement during the sentencing hearing may have been a deliberate trial strategy. This Court cannot second guess Hodges' attorney. *See Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991). When evaluating the overall performance of counsel, counsel must make strategic discretionary decisions including whether or not to file certain motions, call certain witnesses, ask certain questions, or make certain objections. *Cole v. State*, 666 So. 2d 767, 777 (Miss. 1995). In the victim impact statement Bessie Tatum states that "my wish is that he will be put away for life with no parole so that he will not hurt anyone else. I do not believe in killing but if the Court choose to do other wish than do so." The victim impact statement evidences the fact that she would not object to Hodges being put to death. This clearly could have been a strategic decision by defense counsel, and this Court has already stated that it would not second guess defense counsel. Defense counsel was not deficient for failing to introduce this information.

### d. Failure to adequately confront State witness Johnny Robbins

¶79. Hodges claims that defense counsel was ineffective for failing to object to the State's introduction of the conviction and for failing to adequately cross-examine Robbins. Hodges claims that counsel failed to conduct a pre-trial interview of this witness and failed to elicit mitigation evidence from Robbins concerning Hodges' character and behavior while serving in the RID program.

¶80. Johnny Robbins served as a witness for the sole purpose of introducing Hodges' burglary conviction into evidence at sentencing. This evidence supported the State's aggravator that the capital murder was committed while Hodges was under a sentence of imprisonment. First, it was not ineffective for failing to object to the State's introduction of a copy of the

44

conviction. This Court has held that the admission of a sentencing order was an efficient way to prove the under a "sentence of imprisonment" aggravator. *Jenkins v. State*, 607 So. 2d 1171, 1180 (Miss. 1992). "Failure to raise meritless objections is not ineffective lawyering." *Brown v. State*, 798 So. 2d 481, 494 (Miss. 2001) (citing *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)). Therefore, Hodges' counsel was not ineffective for failing to object to the introduction of the conviction.

¶81. Hodges also argues that defense counsel was ineffective for failing to adequately cross-examine Robbins. Hodges claims that mitigation evidence could have been elicited through adequate cross-examination. Hodges claims that defense counsel could have questioned Robbins about Hodges personally. In support of this claim, Hodges submits a report that states that during the RID program Hodges was cooperative and made a good effort to fulfill the requirements for graduation. However, there is no indication that Robbins knew Hodges personally and could have testified to this information. The only reason Robbins testified was to introduce evidence relating to the under imprisonment aggravator. During cross, defense counsel was able to use this witness to show that the RID program is used for first-time, non-violent offenders and to teach self-respect and discipline. Defense counsel was not deficient in cross-examining Robbins. Even assuming that Miller failed to adequately cross-examine Robbins, there is no prejudice arising from this failure. The defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Any additional evidence in mitigation was not of a nature to cast any doubt as to the propriety of the jury's verdict and, as a result, this claim is without merit.

45

## 2. Trial Court's denial of overnight recess before closing argument

¶82.    After the close of evidence at the sentencing phase defense counsel requested an overnight recess in order to prepare for closing.  The trial court denied this request and Hodges now claims that this denial by the trial court caused him to suffer ineffective assistance of counsel.  This is not an ineffective assistance of counsel claim to be analyzed under the *Strickland* standard.  "Ordinarily, trial judges have broad discretion in determining when trials will begin and how long they will continue on any given day." *Dye v. State*, 498 So. 2d 343, 344 (Miss. 1986).  There is not a "bright line rule" as to when a trial judge should grant a continuance or recess.  *Hooker v. State*, 716 So. 2d 1104, 1113 (Miss. 1998).  This Court's analysis focuses upon the unique facts of each case. *Id.*

¶83.    This Court has held that a denial for a recess can deny the defendant the right to effective assistance of counsel.  *Thornton v. State*, 369 So. 2d 505 (Miss. 1979).  In *Thornton*, the State rested its case-in-chief at about 6:00 p.m. and the defense counsel moved for a recess stating that he was exceedingly tired.  *Id.* at 506.  The trial judge refused to grant the defendant's request for a recess.  *Id.*  Subsequently, the defendant was forced to put on his defense which lasted until approximately 10:00 p.m.  *Id.*  The parties had to then submit their objections to the submitted jury instructions and then make closing arguments.  *Id.*  Both sides were given one hour for closing.  *Id.*  After making closing arguments, the defendant's attorney became ill and was rushed to the hospital.  *Id.*  The case sub judice is clearly distinguishable.

¶84. There is no evidence in the record of an undue burden upon counsel in continuing the case to conclusion and no indication in the record that the jury had difficulty in proceeding with the case. The culpability phase began on September 10, 2001, and the verdict was rendered on the 13th at 1 p.m. The sentencing phase began at 2 p.m. on September 13, 2001, which was only the third day of the trial. Before closing argument in the sentencing phase, the jury requested pizza for dinner. The jury was then sent to deliberate and was also given their dinner at this time. The case was submitted to the jury around dinner time. The record does not indicate when closing arguments began but if the case was submitted to the jury around dinnertime it could not have been that late. The jurors never indicated that they were tired and did not want to continue. As stated above, trial judges have broad discretion in determining when trials will begin and how long they will continue on any given day. Based upon the facts in the record, the trial judge did not abuse his discretion in denying defense counsel's request for an overnight recess before closing arguments.

### 3. Properly prepare Hodges for his testimony

¶85. Defense counsel advised Hodges against testifying and explained to him the reasons why he should not testify. After counsel advised Hodges, he chose to testify. Hodges now claims that counsel was ineffective for failing to adequately prepare him for his testimony. This failure, according to Hodges, opened him up to all prior charges because counsel did not explain the difference between a charge and a conviction. In support of this claim Hodges submits the affidavit of his trial counsel, Miller, in which Miller states that he did not have time to prepare Hodges to testify.

¶86.    During the sentencing phase the court asked Hodges if he wanted to testify and Hodges stated that he did not want to testify. When asked why he did not want to testify Hodges stated that it was because the State "is trying to bring up the background and my situation and stuff." The Court then gave defense counsel a thirty-minute recess to enable defense counsel to talk to Hodges about testifying. Hodges then informed the court that he wanted to testify. Hodges now claims that he was not adequately prepared to testify. There is nothing in the record to suggest that counsel did not discuss his testimony. They were given a thirty minute recess in which to discuss whether or not to testify. Hodges was aware that if he testified, the State could go into his criminal history. There is also no evidence that Hodges did not know the difference between a charge and conviction. During direct examination Hodges testified that he had only been charged with one other crime - burglary of a dwelling (Cora's house). He was then asked if he had ever been convicted of any other crimes other than the burglary of Cora's dwelling and he said "no". During cross the State brought out the fact that Hodges had also been charged with other crimes.

¶87.    The only thing alleged that was caused by this failure to prepare was the fact that Hodges did not know the difference between a charge and a conviction and this caused his other charges to come in during cross. Assuming that defense counsel was deficient because Hodges did not know the difference between a charge and a conviction, Hodges has not shown that he was prejudiced by this information and that the result of the proceeding would have been different. Hodges was aware that the State could go into his criminal history but Hodges chose to testify after his counsel advised against testifying. The jury already knew that Hodges had been

48

charged with these other crimes. This information can not cause prejudice when it was already before the jury. Therefore, absent a showing of prejudice, this issue is without merit.

### 5. Failure to Instruct on Ineligibility for Parole.

¶88. Hodges claims that the jury was improperly instructed on the verdict form that, "if the jury cannot agree on punishment, the court must sentence the Defendant to a term of life imprisonment with the possibility of parole." Hodges also claims that the State exacerbated this problem by informing the jury during closing argument that the jury had the option of sentencing Hodges to life with parole. Hodges argues that these statements violate Mississippi law, which requires the jury to have been instructed that the sentence was without parole. He claims his due process rights were violated where the jury was given an inaccurate explanation concerning parole and erroneously believed Hodges could receive parole. Hodges argues that this requires his sentence to be vacated.

¶89. The State argues that the court complied with Mississippi law in instructing the jury, pursuant to Miss. Code Ann.§ 97-3-21 which provides that "every person who shall be convicted of capital murder shall be sentenced (a) to death; (b) to imprisonment for life in the State Penitentiary without parole; or (c) to imprisonment for life in the State Penitentiary with eligibility for parole as provided in Section 47-7-3(1)(f)." The State argues that the court instructed the jury on all three options and the jury returned a death sentence. The State claims that even if there was an error, it was harmless error which does not require reversal.

¶90. The verdict form states that "[y]ou have found the Defendant guilty of the crime of Capital Murder. You must now decide whether the Defendant will be sentenced to death, or life imprisonment without the possibility of parole, or life imprisonment with the possibility

49

of parole." The verdict form then goes on to instruct the jurors how their verdict should read if they sentenced him to death, if they sentence him to life imprisonment without parole, if they sentence him to life with possibility of parole and if they could not agree on a sentence. The jury was instructed on all three options, and the jury chose death. As mentioned previously, the main part Hodges now objects to is where the verdict form states that "if the jury cannot agree on punishment, the court must sentence the Defendant to a term of life imprisonment with the possibility of parole." Hodges, during trial, objected to the form of the verdict but it was the part that dealt with the aggravators. The part Hodges brings up in this present appeal was not objected to at trial thus barring appeal on that issue. *Holland v. State*, 705 So. 2d 307, 352-53 (Miss. 1997) (citing *Cole v. State*, 525 So. 2d 365, 369 (Miss. 1987)). The verdict form was included in Instruction C-1, to which Hodges, at the time, made no objection to this part. Any objection to this part of the verdict form should have been made when the instructions were being considered. Procedural bar notwithstanding, this Court will consider this issue on the merits.

¶91. Hodges cites *Turner v. State*, 573 So. 2d 657 (Miss. 1990), for the proposition that the court must instruct the jury that a life sentence means life without parole. However, that case is distinguishable from the case sub judice. In *Turner*, the issue was whether the trial court erred in failing to instruct the jury that the appellant would never be eligible for parole since he was a habitual-offender. *Id.* at 673. This Court held that the remedy for failure to conduct the habitual offender status hearing prior to the sentencing phase and failure to properly instruct the jury on the meaning of "life" is to vacate the death sentence and remand for new sentencing trial with proper instructions. *Id.* at 675. However, the case sub judice is

50

not dealing with habitual offender status. Hodges would like us to extend the rule in *Turner* to the case sub judice because parole is not offered to defendants convicted of capital murder. However, this Court has held that the constitutional right to inform the jury that he was not entitled to parole has not been extended to defendants who are not habitual offenders. *Smith v. State*, 724 So. 2d 280, 295 (Miss. 1998). Hodges was not entitled to an instruction regarding his ineligibility for parole because he was not a habitual offender.

¶92. However, Hodges also claims that the trial court erred in instructing the jury, in the verdict form, that if they did not agree on a verdict that the court *must* sentence the defendant to a term of life imprisonment with the possibility of parole. Hodges argues that this misinformed the jury concerning the law in this matter and his death sentence should be vacated. He claims this error was also exacerbated when the State in closing argument stated that if the jury did not reach a verdict the court would sentence Hodges to life with parole. In *Williams v. State*, 445 So. 2d 798, 813 (Miss. 1984), this Court held that:

> A jury should have no concern with the quantum of punishment because it subverts a proper determination of the sentencing issue. Reference to the possibility of parole should the defendant not be sentenced to die are wholly out of place at the sentencing phase of a capital murder trial for two additional reasons.
>
> First, such references inevitably have the effect of inviting the jury to second guess the Legislature. The Legislature has declared that persons sentenced to life imprisonment may under certain circumstances become eligible for parole. Mississippi Code Annotated section 47-7-3(1) (Supp.1982). It is no more proper for the jury to concern itself with the wisdom of that legislative determination than it is for the jury to consider the Legislature's judgment that death in the gas chamber be an authorized punishment for capital murder. *Johnson v. State*, 416 So. 2d 383, 392 (Miss. 1982).
>
> Second, parole is not automatic. No person sentenced to life imprisonment has any "right" to parole. *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 11, 99 S. Ct. 2100, 2105, 60 L.

> Ed. 2d 668, 677 (1979); ***Davis v. State***, 429 So. 2d 262, 263 (Miss. 1983). Allowing argument or testimony regarding the possibility of the defendant some day being paroled is in effect inviting the jury to speculate how ten years in the future the parole board may exercise its legislatively granted discretionary authority. This would introduce into the sentencing proceedings an "arbitrary factor" proscribed by section 99-19-105(3)(a).

(Emphasis omitted). This Court in ***Williams*** did state that parole consideration at a death penalty trial was improper. 445 So. 2d at 813. This Court did find error in the prosecutor's repeated questioning of a defense expert about the expert's understanding that a life sentence usually meant thirty years in prison. ***Id.*** at 814. Likewise, it was error for the verdict form to state that if the jury did not agree on a verdict that the court must sentence the defendant to a term of life imprisonment with the possibility of parole. It was also error for the State to comment on this during its closing argument. However, in ***Williams***, this Court went further and stated that the discussion of parole was improper but found that the error was reversible only in that the trial court also erred in several other respects (discussion of the defendant's right not to testify and discussion of the defendant's right to appeal at different levels). ***Id.*** "It is not necessary to hold that the instant error standing alone constitutes reversible error." ***Id.*** In ***Williams***, this Court found that "it may be true that none of these errors considered above would require reversal, but when they are considered as a whole for their aggregate effect, it becomes clear that Williams was denied a fair sentencing hearing." ***Id.*** "In sum, the parole consideration error was only reversible in conjunction with the other errors in the Williams case." ***Smith v. State***, 877 So. 2d 369, 381 (Miss. 2004).

¶93. Furthermore, the trial court strictly followed the language of the statutes and the jury was instructed in the verdict form of all three alternatives: death, life imprisonment without

parole, and life imprisonment with possibility of parole. The following statutes are relevant to determination of this issue:

> Upon conviction or adjudication of guilt a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility of parole, or life imprisonment....
> Miss. Code Ann. § 99-19-101(1) (1994).

> If the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life.
> Miss. Code Ann. § 99-19-103 (1994).

> (e) No person shall be eligible for parole who, on or after July 1, 1994, is charged, tried, convicted and sentenced to life imprisonment without eligibility for parole under the provisions of Section 99-19-101;
> (f) No person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under the provisions of Section 99-19- 101; …
> Miss. Code Ann. § 47-7-3(1)(e)-(f) (amended 1994).

> (1) An inmate shall not be eligible for the earned time allowance if:
> (a) The inmate was sentenced to life imprisonment; but an inmate, except an inmate sentenced to life imprisonment for capital murder, who has reached the age of sixty-five (65) or older and who has served at least fifteen (15) years may petition the sentencing court for conditional release; ...
> Miss. Code Ann. § 47-5-139(1)(a) (amended 1994 & 1995).

While it is true that the statute does provide for three alternatives, it is also true that the earned time allowance and parole statutes effectively eliminate the possibility of parole for someone convicted of capital murder. This is an inconsistency in statutes that needs to be addressed by the Legislature. However, the question now becomes whether this inconsistency caused prejudicial error in the case at bar. Where the jury imposes the death penalty, the fact that the jury was given the option of parole does not constitute harmful error. As this Court stated in *Puckett v. State*, 737 So. 2d 322, 363 (Miss. 1999),

the true harmful error would arise in those cases where the trial court strictly follows the language of § 99-19-101 in capital murder cases, submits all three options to the jury, and the jury selects the option of life imprisonment. In this instance, the defense could argue that the jury was misled in that they selected the life imprisonment sentence with the assumption that the defendant may be eligible for parole, when in reality the defendant would not be eligible for parole by virtue of the parole and earned time statutes.

The true harmful error situation did not occur in the case sub judice. The jury was given all three alternatives but it sentenced Hodges to death and not life imprisonment. Based on *Williams* and *Puckett*, this issue is without merit.

¶94. Furthermore, this Court finds that the language on the verdict form stating that "if the jury cannot agree on punishment, the court must sentence the Defendant to a term of life imprisonment with the possibility of parole" was improper because it was an incorrect statement of law. Pursuant to Miss. Code Ann. § 99-19-101, the judge must "impose a sentence of imprisonment for life" when the jury cannot agree on the punishment and under our parole statutes a life sentence rendered pursuant to Miss. Code Ann. § 99-19-101 will automatically be a life without parole sentence. Even though this language in the verdict form was an improper statement of the law, such error was harmless since the jury, knowing that it had the life without parole option, chose death.

### 6. Indictment.

¶95. Hodges claims that the capital murder indictment charging an underlying felony of burglary with the intent to commit an assault was defective for failure to specify the intended victim of that assault. Further, Hodges argues that the State's proof at trial was insufficient to support a viable theory of assault with respect to the burglary and the State presented different theories with respect to the burglary which were inconsistent with a theory of intent to assault.

He claims that he was denied a fair trial in that he could not adequately prepare a defense before trial.

¶96.    The State argues that the indictment was not defective and fully complied with the applicable law.  The State also claims that Hodges is procedurally barred from raising this issue on appeal because they never objected to or raised it during the trial.  However, "this Court has squarely held that challenges to the substantive sufficiency of an indictment are not waivable. Thus, they may be first raised at anytime, including on appeal." *State v. Berryhill*, 703 So. 2d 250, 254 (Miss. 1997).  *See also Copeland v. State*, 423 So. 2d 1333 (Miss. 1982) (substantive failure of an indictment to charge a crime was not waivable and not subject to amendment); *Burchfield v. State*, 277 So. 2d 623 (Miss. 1973); *Monk v. State*, 532 So. 2d 592 (Miss. 1988), *superseded by rule on other grounds* (objection to an indictment that failed to charge an essential element of the crime sought to be charged may be raised for the first time on appeal).  Therefore Hodges is not procedurally barred from raising this issue on appeal.

¶97.    The standard of reviewing the sufficiency of indictments is well settled.  "It is a well-established principle of law that in order for an indictment to be sufficient, it must contain the essential elements of the crime charged." *Peterson v. State*, 671 So. 2d 647, 652-53 (Miss. 1996) (citing *May v. State*, 47 So. 2d 887 (Miss. 1950)).  An indictment shall also include the seven factors enumerated in URCCC 7.06:

    (1) The name of the accused;
    (2) The date on which the indictment was filed in each court;
    (3) A statement that the prosecution is brought in the name and by the authority
    of the State of Mississippi;
    (4) The county and judicial district in which the indictment is brought;

(5) The date and if applicable the time, on which the offense was alleged to be committed. Failure to state the correct date shall not render the indictment insufficient;

(6) The signature of the foreman of the grand jury issuing it; and

(7) The words "against the peace and dignity of the state".

The indictment is held to be sufficient if it contains the seven factors enumerated in URCCC 7.06. *Byrom v. State*, 863 So. 2d 836, 865 (Miss. 2004).

¶98.    In the case sub judice the indictment states that

Quintez Hodges late of the County aforesaid, on or about the 20th day of July, 1999, in the County aforesaid, did unlawfully, wilfully, and feloniously, with or without the design to effect death, kill and murder Isaac Johnson, a human being, without authority of law and not in necessary self defense, while engaged in the commission of the crime of burglary, to-wit: in that the said Quintez Hodges did on or about the 20th day of July, 1999, in the County aforesaid, did unlawfully, wilfully, feloniously and burglariously break and enter the dwelling house of Isaac Johnson, with the intent to unlawfully, wilfully, feloniously, purposely and knowingly commit the crime of assault therein; in violation of section 97-3-19(2)(e) MCA 1972 as amended; contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State of Mississippi.

The indictment above contains all the seven factors enumerated in URCCC 7.06. Therefore the indictment in the case sub judice is sufficient. *Byrom*, 863 So. 2d at 865. The indictment contains the essential elements of the crime and gives Hodges notice of the charges. Furthermore, as a general rule, an indictment which tracks the language of a criminal statute it is sufficient to inform the accused of the charge against him. *Stevens v. State*, 808 So. 2d 908, 919 (Miss. 2002) (citing *Ward v. State*, 479 So. 2d 713, 714 (Miss. 1985)). According to Miss. Code Ann. § 97-3-19(1)(c), capital murder requires a charge of an underlying felony. In this case the underlying felony was burglary, which is the breaking and entering of a dwelling house with the intent to commit some crime. Miss. Code Ann. § 97-17-19 (1972). This Court

has held that since the offense of burglary itself requires an underlying crime, an indictment for burglary that does not specify what crime the accused intended to commit is fatally defective. *Lambert v. State*, 462 So. 2d 308, 311 (Miss. 1985) (citing *Newburn v. State*, 205 So. 2d 260 (Miss. 1967). The indictment of Hodges followed the criminal statute. It charged him with capital murder with an underlying felony of burglary and specified what crime the accused intended to commit - assault.

¶99. However, Hodges cites *State v. Berryhill*, 703 So. 2d 250 (Miss. 1997), for the proposition that the indictment above is defective for failing to specify the intended victim of the assault. In *Berryhill*, this Court held that a capital murder indictment predicated on burglary is required to state with specificity the underlying offense that comprises the burglary. *Id.* at 258. This Court observed that a capital murder charge that is predicated upon burglary must include notice of the crime comprising the burglary because burglary requires as an essential element, the intent to commit another crime. *Id.* at 255-56. Without notice of the other crime, the accused cannot defend the charge against him. *Id.* Furthermore, in *Berryhill*, this Court stated that

> [a]n indictment that fails to give notice to a defendant of the charges to which he has been hailed into court to defend will fail to provide him an opportunity to prepare a defense. We have repeatedly held that an indictment must give notice of the nature and cause of the charges, although a reasonably concise statement of the crime will suffice.

*Id.* Also, a defendant who has been indicted without specifying may find out on the eve of trial that the State might try to prove the burglary on different theories, which would plainly invite different defenses. *Id.*

57

¶100. The indictment in the case sub judice complies with the rule set forth in **Berryhill**. The indictment charged Hodges with capital murder with the underlying felony of burglary. Since the underlying felony was burglary, the State was required to specify the underlying offense, which they did. It charged Hodges with burglary with the intent to commit an assault therein. This Court has stated that

> [t]he allegation of the ulterior felony intended need not, however, be set out as fully and specifically as would be required in an indictment for the actual commission of that felony. It is ordinarily sufficient to state the intended offense generally, as by alleging an intent to steal, or commit the crime of larceny, rape or arson.

**Booker v. State**, 716 So. 2d 1064, 1068 (Miss. 1998) (citing Am. Jur. 2d *Burglary* § 36 (1964)). Therefore, all the State was required to do was state the intended offense generally by alleging the intent to assault. The State did exactly what was required. Hodges was able to prepare a defense and was well aware, from the indictment, that the State intended to prove burglary with the intent to commit an assault therein. The State did not try to prove different theories of burglary as Hodges claims. The State set out to prove that Hodges went to Cora's house that night armed with a gun and intended to shoot Cora and/or Bessie Tatum. Hodges himself told Cora on the night of the shooting that he went to her house to shoot her and/or Bessie Tatum (if she had been home). Hodges also told his friend, Anthony Betts, that he was going to buy a gun and kill somebody. Hodges then went to Cora's house that night armed with a gun. Hodges has not shown that he was prejudiced in the preparation of his defense. This issue is without merit.

**7 & 14. Death Penalty Elgibility.**

¶101. Hodges argues that **Ring v. Arizona**, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d

58

556 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L. Ed. 2d 435 (2000), require that his sentence be vacated. Since both of these issues deal with the application of *Apprendi* and *Ring*, these two issues will be combined.

¶102. First, Hodges contends that his indictment was improper as it failed to enumerate the aggravating factors and the mens rea element. Hodges claims that *Williams v. State*, 445 So. 2d 798, 804 (Miss. 1984), which held that the indictment in a death penalty case need not include aggravating circumstances, must be reconsidered in light of *Apprendi* and *Ring* in which the Court held unconstitutional a sentencing scheme where a judge rather than a jury determined whether there were sufficient aggravating circumstances to warrant imposition of the death penalty. Hodges also argues that *Ring* prohibits the duplicative use of the burglary aggravator at the penalty phase when the jury had previously found that Hodges committed the crime at the culpability phase. This Court has previously discussed all of these issues as they relate to *Ring* and *Apprendi*. As this Court has continuously held, these cases have no application to Mississippi's capital murder sentencing scheme. Therefore, these issues are without merit. *See Berry v. State*, 882 So. 2d 157, 170-73 (Miss. 2004) (We have previously discussed these cases at length and concluded that they address issues wholly distinct from our law, and do not address indictments at all).

¶103. In *Berry v. State*, 882 So. 2d 157 (Miss. 2004), we held that:

> Mississippi's capital scheme is distinct from Arizona's in the single, most relevant respect under the *Ring* holding: that it is the jury which determines the presence of aggravating circumstances necessary for the imposition of the death sentence. *See* Miss. Code Ann. § 99-19-101 (2000).
> Likewise, the *Ring* court considered Mississippi's scheme to be part of a majority of states who have responded to its Eighth Amendment decisions and

require that juries make the final determination as to the presence of aggravating circumstances. *Ring*, 536 U.S. at 608 n. 6.

*Berry*, 882 So. 2d at 173. In *Stevens v. State*, 867 So. 2d 219 (Miss. 2003), the defendant argued that his death sentences should be vacated because the aggravating circumstances which charged capital murder were not included in his indictment. In *Stevens*, the defendant also relied on *Ring* and *Apprendi*. *Id.* at 225. This Court held that:

> The State is correct in its assertion that a defendant is not entitled to formal notice of the aggravating circumstances to be employed by the prosecution and that an indictment for capital murder puts a defendant on sufficient notice that the statutory aggravating factors will be used against him. *Smith v. State*, 729 So. 2d 1191, 1224 (Miss. 1998) (relying on *Williams v. State*, 445 So. 2d 798 (Miss. 1984)).
> We believe that the fact that our capital murder statute lists and defines to some degree the possible aggravating circumstances surely refutes the appellant's contention that he had inadequate notice. Anytime an individual is charged with murder, he is put on notice that the death penalty may result. And, our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment. *Id.* at 804-05. This issue is without merit.

*Stevens v. State*, 867 So. 2d at 227. *See also* *Puckett v. State*, 879 So. 2d 920 (Miss. 2004); *Holland v. State,* 878 So. 2d 1, 9 (Miss. 2004).

¶104. In *Wilcher v. State*, 697 So. 2d 1087, 1108 (Miss. 1997), this Court held:

> Wilcher also argues that the use of the underlying felony as an aggravating circumstance violates the Eighth Amendment in that it does not "genuinely narrow" the class of death-eligible defendants. Wilcher did not raise this issue at trial, and therefore, is procedurally barred from doing so on appeal. *Walker v. State*, 671 So. 2d 581, 612, (Miss. 1995) (citing *Foster v. State*, 639 So. 2d 1263, 1270; *Cole v. State*, 525 So.2d 365, 369 (Miss. 1987)). Furthermore, even if the issue were not procedurally barred, this Court has repeatedly rejected the argument raised by Wilcher:
>> The use of the underlying felony ... as an aggravator during sentencing has been consistently upheld in capital cases. This Court has stated:

60

> > The argument is the familiar "stacking" argument that the state can elevate murder to felony murder and then, using the same circumstances can elevate the crime to capital murder with two aggravating circumstances. As pointed out in *Lockett v. State*, 517 So. 2d 1317, 1337 (Miss. 1987), this Court has consistently rejected this argument.
>
> *Minnick v. State*, 551 So. 2d at 96-97. The United States Supreme Court has confirmed that this practice does not render a death sentence unconstitutional. *Lowenfield v. Phelps*, 484 U.S. 231, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988). *See also, Ladner v. State*, 584 So. 2d 743, 763 (Miss. 1991).

*Walker*, 671 So.2d at 612.

. . .

Our precedents make clear that a State's capital sentencing scheme must ... *genuinely narrow* the class of defendants eligible for the death penalty. When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. *If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm*.

*Blue v. State*, 674 So. 2d 1184, 1216 (Miss. 1996) (quoting *Arave v. Creech*, 507 U.S. 463, 474, 113 S. Ct. 1534, 1542, 123 L. Ed. 2d 188 (1993)) (emphasis in original).

Not every defendant eligible for the death penalty will have committed murder while in the course of robbery or Kidnaping or the other statutorily enumerated felonies. *See* Miss. Code Ann. § 97-3-19. Therefore, the felony murder aggravator genuinely narrows the class of defendants eligible for the death penalty. Furthermore, "[t]he legislature has a very great latitude in prescribing and fixing punishment for crime." *Smith v. State*, 419 So. 2d 563, 567 (Miss. 1982), *overruled on other grounds, Willie v. State*, 585 So. 2d 660, 681 (Miss. 1991).

Moreover, the aggravating factor for murder committed during the course of a robbery is constitutional. *See Lowenfield v. Phelps*, 484 U.S. 231, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988). *See also Lockett v. State*, 614 So. 2d 888, 897 (Miss. 1992) ["This Court has previously determined that Mississippi's capital sentencing scheme, as a whole, is constitutional."]. For these reasons, Wilcher's argument fails.

*Wilcher*, 697 So. 2d at 1108-09.

¶105. It is clear that *Apprendi* and *Ring* are not applicable to Mississippi law. As this Court stated in *Berry,* Mississippi's capital scheme is distinct from Arizona's. The single most relevant distinction is that it is the jury which determines the presence of aggravating circumstances necessary for the imposition of the death sentence under Mississippi law. Therefore, these two issues are without merit.

### 8. Cause Exclusion of Prospective Juror.

¶106. Hodges argues that the trial court erroneously removed venire member number 69 on the grounds that his views on the death penalty seemed unclear. Hodges claims that the juror's views on the death penalty were unequivocal and did not justify a challenge for cause.

¶107. In answering the questionnaire, the juror answered no to the question, "could you ever personally vote to impose the death penalty?." During the questioning by the trial judge, the juror said that he could never vote to impose the death penalty and then changed and said that it depended on the crime. The juror also said he had a conscious and moral belief against the death penalty and that he might be able to impose the death penalty in the right case but would have to pray. During the questioning by the State, the juror stated that he could not be fair to the other options because he would favor the verdict of life over death. When Hodges questioned the juror, he changed his answer and stated that after he heard all the evidence he could consider the death penalty. Hodges argues that the juror expressed consistent views throughout the questioning by the court.

¶108. The test for determining when a prospective juror's views on the death penalty justify his removal is whether the trial court finds that the "juror's views would prevent or substantially impair the performance of his duties in accordance with his instructions and his

62

oath" and leaving the trial court "with definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *King v. State*, 784 So. 2d 884, 887 (Miss. 2001) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424-26, 105 S. Ct. 844, 852-53, 83 L. Ed. 2d 841, 851-52 (1985)). If the judge is concerned with the response given, he must further determine whether the potential juror could follow the law as instructed even if the juror expressed a general disapproval of the death penalty. *King*, 784 So. 2d at 887. "This is why deference must be paid to the trial judge who sees and hears the juror." *Id.* (quoting *Wainwright*, 469 U.S. at 426).

¶109. This Court has long held that it is the trial judge's domain to judge matters regarding credibility of a witness including prospective jurors. *Harris v. State*, 527 So. 2d 647, 649 (Miss. 1988). The circuit court judge, as he must, has wide discretion in determining whether to excuse any prospective juror, including on challenged for cause. *Miss. Winn-Dixie Supermarkets v. Hughes*, 247 Miss. 575, 156 So. 2d 734, 738 (Miss. 1963). However, it is reversible error if one juror is erroneously excused from the jury on the basis of his view on the death penalty. *Gray v. Mississippi*, 481 U.S. 648, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987).

¶110. In *King*, the trial judge excluded three potential jurors because of their contradictory responses to the questions regarding the death penalty. *King*, 784 So. 2d at 888. One of the jurors in *King* answered "no" to the question of whether she could personally vote to impose the death penalty. *Id.* at 886-87. The juror then was asked whether she could impose the death penalty even if the evidence warranted it. *Id.* at 887. She responded that she would have to

hear some evidence first. *Id.* Another juror stated that she probably could personally impose the death penalty but in the questionnaire she had stated that she could never impose the death penalty. *Id.* The third juror stated that he could not impose the death penalty but recanted this answer when questioned by defense counsel. *Id.* This Court concluded that because jurors repeatedly switched positions and since the judge had amble opportunity to observe the jurors, the dismissal was not an abuse of discretion. *Id.* at 888. This Court also found no reversible error in the trial court's excluding jurors for cause who gave contradictory responses, wavered on their position, and generally appeared confused regarding the death penalty. *Dufour v. State*, 453 So. 2d 337, 341-44 (Miss. 1984).

¶111. Likewise, in the case sub judice, the trial judge excluded the prospective juror because of his contradictory responses to the questions regarding the death penalty. This case is analogous to the *King* case in that the juror stated in his questionnaire that he could never impose the death penalty but during questioning by the court he stated that he may be able to in the right case. He even went further and stated that he would favor life over death but when questioned by defense counsel he recanted this answer and stated that he could consider all possibilities. "It goes without saying that a potential juror who cannot give a straight answer would be very unlikely to follow the law." *King*, 784 So. 2d 888. "If jurors provide inconsistent answers regarding their feelings on the stated law of this state, they may be struck for cause." *Brown v. State*, 890 So. 2d 901, 910 (Miss. 2004). Given this potential juror's equivocal stance on the issue, the trial court did not abuse its discretion in striking him for cause.

64

## 9. Denial of Mistrial.

¶112. Hodges claims that the trial court erred in denying his request for mistrial or preventing the jury from considering Cora's testimony that Hodges had been incarcerated for burglarizing the Johnson home. Hodges argues that this was irrelevant and inadmissible under M.R.E. 403 and that its prejudice substantially outweighed its probative value. He claims that the court did not conduct a relevancy test and did not provide a limiting instruction. Hodges claims that this mention of his prior charge of burglarizing the Johnson home resulted in an inference of guilt on the capital murder charge. Hodges also argues that this was not harmless error because it is likely that the jury would have found him guilty of trespass instead of burglary. The State argues that this one statement made by Cora during her testimony was unintentionally elicited and that it was harmless in light of the overwhelming evidence of guilt.

¶113. At trial during direct examination, the State asked Cora about her relationship with Hodges. As Cora was testifying to this relationship she mentioned that Hodges had broke into her house and he "got locked up for a year and a half." Hodges objected to this mention of this other crime and requested a mistrial. The Court then allowed the State to direct the witness a little in order to eliminate the possibility of mentioning the crime. The Court allowed the State to lead Cora and took the request for a mistrial under advisement. The trial court overruled Hodges' objection and motion for mistrial as a result of Cora's answer. Nothing more was said regarding his time in jail for breaking into her house. Hodges now contends that a mistrial should have been declared and cites cases in which this Court held that the introduction of other crimes constituted reversible error.

65

¶114. However, this Court has, on numerous occasions, found this error harmless under facts similar to the case sub judice. Similarly, in *Craft v. State*, 656 So. 2d 1156, 1165 (Miss. 1995), this Court held that a witness' reference to another possible crime committed by the defendants did not warrant a reversal where the witness alluded to other crimes only once and "the prosecution did not deliberately ask or infer about whether the defendants had been involved in other offenses." Also in *Watson v. State*, 521 So. 2d 1290, 1294 (Miss. 1988), a witness testified that the defendant "was just telling me he was out of jail . . . ." This Court, declining to reverse, held that the answer was "unresponsive to the question and there was no purposeful effort or intent on the part of the State to elicit such information from the witness." *Id.* This Court went on to say that "assuming arguendo that the answer constituted error, certainly it was harmless error under the facts of this case." *Id.* The Fifth Circuit has held that "fleeting, unexplained reference" to other crime was "obviously not reversible error." *United States v. Webster*, 750 F.2d 307, 336 (5th Cir. 1984).

¶115. In the case sub judice, the prosecutor did not ask Cora about Hodges' jail time from burglarizing her house, but instead asked her about her relationship with Hodges, to which Cora mentioned his jail time he served when he broke into her house. The prosecutor thereafter directed Cora's testimony towards matters involving the relationship which resulted in a child, and the jail time was never again mentioned. Clearly, the prosecution did not deliberately elicit testimony regarding this other crime. As in *Watson*, even assuming arguendo that the answer constituted error, the error was harmless.

¶116. Hodges also argues that it was error for the trial judge not to provide the jury with a limiting instruction, since the evidence was introduced. To support his argument, Hodges cites

*Robinson v. State*, 735 So. 2d 208 (Miss. 1999), which held that the trial court's failure to sua sponte give a limiting instruction on prior bad acts was reversible error. However, *Robinson* was overruled by *Brown v. State*, 890 So. 2d 901 (Miss. 2004). In overruling *Robinson*, this Court held that the trial court is not required to issue a sua sponte limiting instruction when other crimes evidence has been admitted and the defense counsel has the burden of requesting such instruction. *Id.* "It is not per se prejudicial to a defendant if a jury simply hears an isolated instance of a crime or bad act in the course of a trial." *Id.* at 913. In the case sub judice, Hodges did not request a limiting instruction when this isolated instance of a crime or bad act came out during Cora's testimony. Since the trial court is not required to issue such an instruction without a request from Hodges, the trial court did not err when they did not give a limiting instruction.

### 10. Evidence of Other Crimes.

¶117. Hodges claims that the trial court erred in allowing the introduction of evidence that Hodges raped Cora in the vehicle during the time he kidnaped her from her home. Hodges argues that it was not relevant under M.R.E. 404(b) and was more prejudicial than probative under M.R.E. 403. Hodges claims that the trial court did not conduct a balancing test to determine whether the probative value is substantially outweighed by the danger of unfair prejudice. However, the record plainly shows that the trial judge, outside the presence of the jury, heard arguments from both sides and determined that it was "probative and the probative value outweighs the unfair prejudice and the objection is noted and overruled."

¶118. The admissibility and relevancy of evidence is within the discretion of the trial court and, absent an abuse of that discretion, the trial court's decision will not be disturbed on appeal.

*Reynolds v. State*, 784 So. 2d 929, 932 (Miss. 2001). "As long as the trial court remains within the confines of the Mississippi Rules of Evidence, its decision to admit or exclude evidence will be accorded a high degree of deference." *Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990). Additionally, "the admission or exclusion of evidence must result in prejudice or harm, if a cause is to be reversed on that account." *Jackson v. State*, 594 So. 2d 20, 25 (Miss. 1992).

¶119. The Mississippi Rules of Evidence require that evidence be relevant, and, if so, it is generally admissible. M.R.E. 401 & 402. However, even relevant evidence may not be admissible due to prejudice, confusion, or waste of time. M.R.E. 403. Where proof of other crimes or acts of the defendant is offered into evidence pursuant to Rule 404(b), it is still subjected to the requirement that evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. M.R.E. 403. Rule 403 is the "ultimate filter through which all otherwise admissible evidence must pass." *Bounds v. State*, 688 So. 2d 1362, 1370 (Miss. 1997).

¶120. Evidence of prior offenses committed by a defendant, not resulting in conviction, is generally inadmissible either for impeachment purposes or as a part of the State's case in chief. *Neal v. State*, 451 So. 2d 743, 758 (Miss. 1984); *Mason v. State*, 429 So. 2d 569, 572-73 (Miss. 1983); *Gray v. State*, 351 So. 2d 1342 (Miss. 1977). However, our law also recognizes certain exceptions to the rule. *Neal*, 451 So. 2d at 759. This Court has stated that

> [p]roof of another crime is admissible where the offense charged and that offered to be proved are so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences. Such proof of another crime is also admissible where it is necessary to identify the defendant, where it is material to prove motive, and there is an apparent relation

> or connection between the act proposed to be proved and that charged, where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge.

*Id.* Further, "the state has a legitimate interest in telling a rational and coherent story of what happened." ***Shaw v. State***, 513 So. 2d 916, 919 (Miss. 1987) (citing ***Giles v. State***, 501 So. 2d 406 (Miss. 1987); ***Brown v. State***, 483 So. 2d 328 (Miss. 1986); ***Turner v. State***, 478 So. 2d 300 (Miss. 1985); ***Neal v. State***, 451 So. 2d 743 (Miss. 1984)).

¶121. After the trial judge heard arguments from both sides the court determined that "this was a continuous event and transaction, and the State under case law is entitled to show the jury the complete picture of what happened. The Court finds that it is probative and the probative value outweighs the unfair prejudice and the objection is noted and overruled." In the case sub judice, Hodges was charged with capital murder with the underlying felony of burglary and he was also charged with the kidnaping of Cora Johnson. It was shown that Hodges broke into the house where he was confronted by the victim. After shooting Isaac once in the stomach, he went to Cora's room where she had just awakened. Hodges told Cora to get her stuff and that she was going with him. She told Hodges that she was not going anywhere with him and that is when he struck her across the head with the gun. Cora then woke her daughter and prepared to leave with Hodges. During the trip to Alabama, Cora testified that Hodges forced her into the back seat of the car, held a gun to her head and raped her while her daughter was lying in the front seat. The rape of Cora was integrally related in time, place and fact with the murder of Isaac Johnson. The rape arose out of a "common nucleus of operative facts" and was "integrally intertwined" with what happened to Isaac Johnson. ***Wheeler v. State***, 536 So. 2d 1347, 1352 (Miss. 1988). As stated above, this Court has held that proof of another crime is

admissible where the offense charged and that offered are so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences. *Neal*, 451 So. 2d at 759. The rape in the case sub judice is part of a closely related series of occurrences. Also, as this Court has stated in *Neal*, "[w]e are concerned with the State's legitimate interest in telling a rational and coherent story of what happened." *Id.* Not only was the rape integrally intertwined with the murder of Isaac, the rape actually occurred while Cora was being held against her will. The trial court did not err in admitting evidence of the rape. The rape was admissible as part of the res gestae of the events surrounding the crime. This issue is without merit.

### 11. Admission of Victim Photograph.

¶122. Hodges next claims that the trial court erred in admitting State's Exhibit 10, which is a photograph depicting Isaac Johnson's midsection, where the victim was shot, after it had been cleaned and washed. Hodges argues that the picture was prejudicial and lacked any probative value because the State's only purpose in submitting the picture was to inflame the jury. Hodges objected to this picture being admitted into evidence and also tried to stipulate what the prosecution was trying to prove. Hodges cites *McNeal v. State*, 551 So. 2d 151, 159 (Miss. 1989), for the proposition that all photographs which are gruesome or inflammatory are always inadmissible as evidence.

¶123. The admissibility of photographs rests within the sound discretion of the trial court. *Jackson v. State*, 672 So. 2d 468, 485 (Miss. 1996); *Griffin v. State*, 557 So. 2d 542, 549 (Miss. 1990); *Mackbee v. State*, 575 So. 2d 16, 31 (Miss. 1990); *Boyd v. State*, 523 So. 2d 1037, 1039 (Miss. 1988). Moreover, the decision of the trial judge will be upheld unless

there has been an abuse of discretion. *Westbrook v. State*, 658 So. 2d 847, 849 (Miss. 1995). The "discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Hart v. State*, 637 So. 2d 1329, 1335 (Miss. 1994) (quoting *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987)). "The mere fact that the defense is willing to stipulate what the prosecution hopes to prove by admitting the photographs into evidence does not bar their admissibility." *Simmons v. State*, 805 So. 2d 452, 485 (Miss. 2001) (citing *Hughes v. State*, 735 So. 2d 238, 263 (Miss. 1999)). In *Taylor v. State*, 672 So. 2d 1246 (Miss. 1996), this Court noted that photographs have been held "to be so gruesome and inflammatory as to be prejudicial in only one circumstance, a close-up photograph of a partly decomposed, maggot-infested skull." *Id*. at 1270 (citing *McNeal v. State*, 551 So. 2d 151 (Miss. 1989)). "Photographs may nevertheless be admitted into evidence in criminal cases where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory." *Hewlett v. State*, 607 So. 2d 1097, 1102 (Miss. 1992).

¶124. This Court has found that photographs of a victim have evidentiary value when they aid in describing the circumstances of the killing, *Williams v. State*, 354 So. 2d 266 (Miss. 1978); describe the location of the body and cause of death, *Ashley v. State*, 423 So. 2d 1311 (Miss. 1982); or supplement or clarify witness testimony, *Hughes v. State*, 401 So. 2d 1100 (Miss. 1981).

¶125. However, this Court has also continuously held that autopsy photographs are admissible only if they possess probative value. *See Puckett v. State*, 737 So. 2d 322, 338 (Miss. 1999);

71

*Noe v. State*, 616 So. 2d 298 (Miss. 1993). State's exhibit 10 shows the midsection of the body cleaned and washed but before the autopsy began. The picture does not depict him cut up, the picture only shows the midsection of the body with a tiny bullet hole above the navel. The Comment to M.R.E. 401 states that if there is any probative value, the rule favors admission of the evidence. The photograph at issue accurately depicts the wound inflicted upon the victim and the cause of death. It certainly does not rise to the level of gruesomeness noted in *McNeal*. There is absolutely no blood anywhere in the photo, and there is nothing gory, gruesome or inflammatory about the picture. Dr. Hayne testified that the picture was taken to indicate the entrance of the gunshot wound and to show how such positioning affected his organs and blood loss, causing death. Photographs have evidentiary purpose when they describe the circumstances and cause of death. Accordingly, the trial court did not abuse its discretion in admitting the photograph.

### 12. Refusal of Lesser Offense Instructions.

¶126. Hodges claims the trial court erred in denying his request that the jury be instructed on the lesser offense of manslaughter and trespass. Hodges claims that the jury could have reasonably found him guilty of manslaughter and trespass. Hodges argues that the jury could have found that he killed in the heat of passion. Hodges presented an instruction on both manslaughter and trespass. The Court, in refusing to give the manslaughter instruction, stated that "under these facts . . . the offense of manslaughter is not justified."

¶127. The State argues that since this issue was not raised at trial or sentencing, Hodges is barred from raising this issue on appeal. However, this Court has stated that the denial of a requested jury instruction:

> is procedurally preserved by the mere tendering of the instructions, suggesting that they are correct and asking the Court to submit them to the jury. This in and of itself affords counsel opposite fair notice of the party's position and the Court an opportunity to pass upon the matter. When the instructions are refused, there is no reason why we should thereafter require an objection to the refusal unless we are to place a value upon redundancy and nonsense.
>
> *Carmichael v. Agur Realty Co., Inc.*, 574 So. 2d 603, 613 (Miss. 1990). We agree with *Carmichael*, and find that Duplantis is not procedurally barred from review of this assignment. He only needed to tender his suggested jury instruction in order to preserve review.

*Duplantis v. State*, 708 So. 2d 1327, 1339-40 (Miss. 1998). "We d[o] not intend to . . . require litigants to object to the denial of instructions that they themselves have offered." *Id.* Therefore, Hodges only needed to tender his suggested jury instruction in order to preserve review. Hodges is not procedurally barred from raising this issue on appeal since he did tender his instruction to the court.

¶128. This Court has "repeatedly held that the accused is entitled to have the jury instructed that it may consider convicting him of a lesser offense only where there is in the record an evidentiary basis therefor." *Doss v. State*, 709 So. 2d 369, 377 (Miss. 1997) (citing *McGowan v. State*, 541 So. 2d 1027, 1028 (Miss. 1989)). However, "[s]uch instructions should not be granted indiscriminately, nor on the basis of pure speculation." *Id.* Also, "the accused is not entitled to the lesser offense instruction where the evidence that proves the guilt of the lesser offense necessarily proves his guilt of the principal charge." *Id.*

¶129. This Court has already held that when a defendant kills the victim during the commission of a burglary, he is not entitled to a manslaughter instruction. *Coleman v. State*, 804 So. 2d 1032, 1038-39 (Miss. 2002). In *Coleman* this Court stated that

> Miss.Code Ann. § 97-3-27 (2000) provides: [t]he killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony except those felonies enumerated in Section 97-3-19(2)(e) and (f), or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter. Burglary is one of the felonies listed in Miss.Code Ann. § 97-3-19(2)(e) that is excepted by the manslaughter statute. In a case similar to the one at bar, this Court held that a defendant who killed a victim during the commission of rape and armed robbery was not entitled to manslaughter instruction. *Blue v. State*, 674 So. 2d 1184, 1201 (Miss. 1996), overruled on other grounds, *King v. State*, 784 So. 2d 884 (Miss. 2001). The Court reasoned that like burglary, rape and robbery are also felonies excepted by the manslaughter statute. 674 So.2d at 1201.

840 So. 2d at 1038-39. Hodges was charged with a felony excepted by the manslaughter statute, burglary of Cora and Isaac Johnson's home. Moreover, the evidence at trial was clear that Hodges committed burglary. Hodges was told by Cora several times that he was not allowed in her house. The night of the incident, Hodges was specifically told by Cora that she did not want him to come over and that she was going to bed. After talking to Cora, Hodges decided to go over to her house anyway. Before he went to Cora's house, he went home changed into all black clothes and a ski mask. He then got his mother's gun and her car and drove to Cora's house where he parked the car two houses down. Hodges, armed with a gun and dressed in all black, forced the back door open. While prying the door open, Hodges left pry marks on the door and fresh insulation from the door was left scattered on the floor around the door frame. Cora testified that Hodges told her that he came over for the purpose of shooting her and her mother (if she had been home). Clearly, Hodges broke into the house and entered it with the intent to assault.

¶130. In sum, the trial court did not commit reversible error by refusing the manslaughter instructions. This Court has previously held that if the killing was committed during the

74

commission of one of the enumerated felonies in Miss.Code Ann. § 97-3-12(2)(e), one of which is burglary, capital murder is proven and the defendant is not entitled to a manslaughter instruction. *Id.* (citing *Blue*, 674 So.2d at 1201). The evidence is clear. Isaac Johnson was murdered during the commission of a burglary of Isaac and Cora Johnson's home.

¶131. Furthermore, since there was no evidentiary basis in the record for the lesser instruction of trespass, the trial court did not err in denying that instruction. Also, "the accused is not entitled to the lesser offense instruction where the evidence that proves the guilt of the lesser offense necessarily proves his guilt of the principal charge." *Doss*, 709 So. 2d at 377. Therefore this issue is without merit.

### 13. Proof of Kidnaping.

¶132. Hodges claims that the State failed to meet its burden of proof on the kidnaping charge and that the trial court erred in denying his request for a direct verdict and motion for new trial. Hodges contends that there was insufficient evidence to prove that Cora Johnson was confined against her will and the guilty verdict was against the overwhelming weight of the evidence.

¶133. As to the legal sufficiency, this Court has held that reversal can only occur when evidence of one or more of the elements of the charged offense is such that "reasonable fair minded jurors could only find the accused not guilty." *Stevens v. State*, 806 So. 2d 1031, 1058 (Miss. 2001) (citing *Pinkney v. State*, 538 So. 2d 329, 353 (Miss. 1988). As to the weight of the evidence, this Court has held that it has limited authority to interfere with a jury verdict. *McFee v. State*, 511 So. 2d 130, 133-34 (Miss. 1987). This Court looks at all the evidence in the light that is most consistent to the jury verdict. *Id.* The prosecution is given "the benefit of all favorable inferences that may reasonable be drawn from the evidence." *Id.*

"In determining whether a jury verdict is against overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court abused its discretion in failing to grant a new trial." *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997) (citing *Thornhill v. State*, 561 So. 2d 1025, 1030 (Miss. 1989)). This Court must accept as true the evidence favorable to the State. *Wetz v. State*, 503 So. 2d 803, 812 (Miss. 1987).

¶134. Hodges argues that the verdict is against the overwhelming weight of the evidence and the evidence shows that Cora Johnson went with him voluntarily. However, this Court finds that there is ample evidence presented by the State to establish that Cora Johnson was taken against her will.

¶135. Hodges came to the Johnson house dressed in all black, wearing black gloves, wearing a beige ski mask and carrying a gun. After shooting Isaac Johnson, Hodges went to Cora's bedroom where she had just woken up. She testified that she could not remember what exactly woke her up but when she woke up she saw a person dressed in all black and wearing a mask coming towards her room. When the person spoke Cora knew that it was Quintez Hodges. Hodges came into her room and told her to get her stuff and that she was coming with him. Cora responded and told him that she was not going anywhere with him. When Cora told him no Hodges took his gun and hit her across the head. Dr. Joel Butler, who later examined Cora, testified that above her left eyebrow on her left temple there was mild swelling and faint bruising which was consistent with being hit with a blunt object such as a fist. After being hit in the head, Cora picked up her baby, the baby's bottle and went to get some diapers. While she was gathering some things for the baby, Hodges left the room and headed in the direction of

76

the living room. Cora headed across the hall into her mother's room so that she could call 9-1-1. She saw her brother sitting against the wall and whispered to him to call the police. At this time she was not aware of the fact that Hodges had already shot her brother. As she was walking out of her mother's room, Hodges grabbed her arm and told her not to forget what he had told her earlier – that he had a gun and to not act stupid. She testified that she did not want to go with him but he grabbed her and pulled her out the door and had the gun pointed at her side. After pushing her and the baby into the car, Hodges took her to Alabama. During the trip to Alabama, Hodges forced Cora into the back seat and raped her with the gun pointed to her head.

¶136. Hodges claims that the evidence supports that Cora went with Hodges voluntarily. Hodges argues that while they had stopped at a store to get milk for the baby, Cora could have escaped or yelled if she did not want to be there. However, Cora was fifteen years old at the time and had her eleven-month-old baby girl with her. Hodges went into the store but informed her that he would be watching. Cora said that she did not do anything because Hodges had a gun and she was afraid that he would shoot her or her baby. Cora stated that she "wasn't going to jump out of the car and run because [she] was in fear of [her] life and [her] child's life." Hodges had already informed her that he shot her brother and the reason he had gone to her house that night was to shoot her or her mother if she had been there. She was afraid that is she tried to run Hodges would have shot them. Furthermore, it would have been hard for her to run while holding and protecting her baby.

¶137. Taking all the evidence favorable to the State as true, this Court holds that the verdict was not against the overwhelming weight of the evidence. When dealing with the legal

77

sufficiency of the evidence, this Court can only reverse the jury verdict if "reasonable fair minded jurors could *only* find the accused not guilty." *Stevens*, 806 So. 2d at 1058 (emphasis added). There is ample evidence to where the jury could have found that Cora did not go voluntarily. This issue is without merit.

### 15. Avoiding Lawful Arrest Aggravator.

¶138. Hodges claims that the jury was improperly instructed to consider the aggravating factor that, the "Capital Murder was committed for the purpose of avoiding a lawful arrest." Hodges claims that there was no evidence to support the inference that a substantial reason for killing Johnson was to conceal the identity of the killer or to cover his tracks so as to avoid arrest or apprehension. Hodges also asserts that any later act after the killing is irrelevant since the wish to avoid arrest must be the substantial reason for the killing. The State claims that this issue is barred from consideration because Hodges never raised this issue at trial. However, Hodges is not barred from raising this issue because the record clearly shows that Hodges objected to the use of this aggravating factor.

¶139. Under Mississippi law, the death penalty may be imposed only where the jury unanimously finds in writing that sufficient aggravating circumstances exist. Miss. Code Ann. § 99-19-101(3)(b) (Rev. 2000). One such aggravating factor requires the jury to consider whether "[t]he capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." Miss. Code Ann. § 99-19- 101(5)(e) (Rev. 2000).

¶140. The standard for reviewing the sufficiency of the evidence to support an "avoiding lawful arrest" instruction is well settled:

> Each case must be decided on its peculiar fact situation. If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.

*Brown v. State*, 682 So. 2d 340, 355 (Miss. 1996) (citing *Leatherwood v. State*, 435 So. 2d 645, 651 (Miss. 1983)). "[I]t is this Court's role to inquire into whether there is any credible evidence upon which the jury could find the aggravating circumstance in question." *Carr v. State*, 655 So. 2d 824, 854 (Miss. 1995) (quoting *Lanier v. State*, 533 So. 2d 473, 490 (Miss. 1988)). "[J]urors are entitled to make the logical connection between the injuries suffered and finding an inference that the defendant murdered his victim to avoid arrest." *Holland v. State*, 705 So. 2d 307, 355 (Miss. 1997). The defendant's efforts to avoid arrest after the murder may also be considered in connection with this aggravator. *Id.* at 355-56.

¶141. Hodges burglarized the home with the intent to commit an assault. Cora testified that Hodges informed her that the reason he went to her house that night was to kill her and her mother if she had been there. Before arriving at Cora's house, Hodges went home and changed into black clothes, black gloves and a beige ski mask. Hodges did not park in the driveway to the house but parked two houses down. The jury could have easily concluded that Hodges disguised himself in order to conceal his identity and when Isaac still recognized him, Hodges shot him in order to avoid apprehension and eventual arrest. Since efforts to avoid arrest after the murder may also be considered, there is ample evidence of Hodges' continued attempts to avoid arrest. After shooting Isaac, Hodges took the phone off the hook. The jury could have concluded that this was done in order to keep Isaac from calling 911 after he was shot. Hodges also kidnaped Cora and her baby and fled the State. On the way to Alabama, Hodges made Cora

79

throw his ski mask out the window of the car. This Court has held that efforts to dispose of and/or conceal the evidence of the crime are sufficient to support the avoiding arrest instruction. *Wiley v. State*, 750 So. 2d 1193, 1206 (Miss. 1999). To further conceal evidence of his crime, Hodges and his sister hid the gun that was used to shoot Isaac.

¶142. This Court finds ample evidence in the record from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers *or* to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities. The "avoiding lawful arrest" aggravating circumstance was properly submitted to the jury. This issue is without merit.

### 16. Double Jeopardy.

¶143. Hodges claims that the trial court erred in sentencing him to a term of twenty years for kidnaping in violation of the Double Jeopardy Clause. Hodges argues that by using Count II of kidnaping as an aggravating circumstance is punishing Hodges for the crime of kidnaping twice, which is contrary to constitutional law. Citing *Ring* and *Apprendi*, Hodges claims that when the state seeks death charging that the capital murder was committed during the course of a separately charged felony as an aggravating circumstance, a Mississippi defendant may not be punished separately for that felony without violating double jeopardy. The State claims that this issue is barred from consideration because Hodges never raised this issue at trial. However, Hodges is not barred from raising this issue because the record clearly shows that Hodges objected to the use of this aggravating factor. Hodges also filed a motion to bar the use of this aggravator.

¶144. This Court has approved the use of the conviction of crimes in other counts of the indictment as aggravating circumstances in the sentencing phase. *Goodin v. State*, 787 So. 2d 639, 654 (Miss. 2001) (citing *Blue v. State*, 674 So. 2d 1184, 1218 (Miss. 1996)). In *Goodin*, the defendant was convicted of capital murder with the underlying felony of kidnaping and was also convicted of armed robbery. *Id.* at 643. This Court held that the crimes of kidnaping and robbery were separate and distinct acts constituting two separate circumstances and that they were properly before the jury to assist in determining whether to impose a sentence of death. *Id.* at 655. Relying on *Blue*, this Court reasoned that aggravating circumstances carry no penalty. *Id.* at 654. "The only purpose aggravating circumstances serve is to narrow the class of individuals most worthy of receiving the death penalty and to furnish guidance to the jury in determining whether to impose a sentence of death in a capital murder case." *Id.*

¶145. The case sub judice is factually similar to *Goodin*. Hodges was convicted of capital murder with the underlying felony of burglary and was also convicted of kidnaping. The crimes of kidnaping and burglary are separate and distinct acts constituting two separate circumstances. Therefore, they were properly before the jury to assist in determining whether to impose the sentence of death. Furthermore, Hodges' reliance *Apprendi* and *Ring* is misplaced for the same reasons as discussed above. This Court has held that the use of two distinct acts as aggravating circumstances is proper. *Goodin*, 787 So. 2d at 655. Under Miss. Code Ann. § 1-3-4 (Rev. 1998), the maximum punishment of a person convicted of capital murder is death. Therefore, *Apprendi* is inapplicable because unlike Arizona's statutory

81

scheme that required a finding of an aggravating circumstance to make a defendant death eligible, Mississippi's law defines that convictions of certain crimes render the defendant death eligible. Thus, after Hodges was convicted of capital murder, he became eligible for the death penalty. The jury then made the appropriate determinations of aggravating and mitigating circumstances and determined that there were insufficient mitigating circumstances to outweigh the aggravating circumstances, and that the defendant should suffer death. As discussed more fully above, it is clear that *Apprendi* and *Ring* are not applicable to Mississippi law. Therefore, this issue is without merit.

¶146. Hodges also claims that Hodges could not be punished for kidnaping and capital murder with kidnaping as an underlying felony. Hodges cites *Meeks v. State*, 604 So. 2d 748, 752 (Miss. 1992), for the proposition that a defendant could not be punished separately for kidnaping and capital murder with kidnaping as the underlying felony. However, *Meeks* does not apply to the case sub judice because Hodges was convicted of capital murder with burglary and not kidnaping as the underlying felony.

### 17. Record of Jury Instructions.

¶147. Hodges claims error in the fact that the jury instructions were not transcribed as part of the trial record, even though such action was requested by the attorneys at trial. Hodges claims that the trial court's failure to secure a transcription of the jury instructions deprived him of a fair trial and a fair review of that trial on appeal, requiring reversal of his conviction and sentence. The State claims that Hodges is procedurally barred from raising this issue. In the instant case, Hodges failed to comply with M.R.A.P. 10(b)(5), which required him to bring such issue to the court reporter's attention within fourteen days. This Court has held on

82

numerous occasions that "it is the duty of the appellant to see that the record of the trial proceedings wherein error is claim[ed] is brought before this Court." ***Jackson v. State***, 684 So. 2d 1213, 1226 (Miss. 1996) (quoting ***Smith v. State***, 572 So. 2d 847, 849 (Miss. 1990)). Therefore, this issue is procedurally barred. Procedural bar notwithstanding, this Court will consider this issue on the merits.

¶148. This Court has held that when the defendant does not claim any error from the proceedings which are missing from the record the defendant is not prejudiced by the unfortunate missing portions of the record and reversal is not required. ***Watts v. State***, 717 So. 2d 314, 317 (Miss. 1998). In the case sub judice, Hodges does not claim any specific error from the proceedings which were missing, i.e., the transcription of the jury instructions. Therefore, this Court holds that Hodges is not prejudiced by the missing portions of the record. Furthermore, the case sub judice is also similar to ***Simmons v. State***, 805 So. 2d 452, 506 (Miss. 2001), where this Court held that it was difficult to ascertain exactly what effect the inclusion of the absent jury instructions would have achieved. In ***Simmons***, a true copy of the jury instructions were missing from the record but affidavits and copies of transcripts of the instructions being read were included within the record. ***Id.*** This Court held that the record was sufficient to analyze all of the issues and properly review the case. ***Id.***

¶149. Hodges does not claim any error from the proceedings which are missing from the record. Even though there was no transcription of the instructions read to the jury, copies of all the instructions which were read to the jury are included in the court's papers. Furthermore, the parties and the court conducted thorough and detailed, on the record hearings concerning the jury instructions. The record also indicates that the jury instructions were read to the jury

by the Judge.  Since the instructions were included in the court's papers Hodges was not denied

a fair review of trial on appeal.  This was sufficient to analyze all of the issues and properly

review the case and since Hodges does not raise any error from this portion of the

proceedings, this issue lacks merit.

### 18.  Cumulative Error.

¶150.  Hodges asks this Court to reverse his conviction based upon the combined effect of all

of the alleged errors at his trial.  He argues that when viewing the prejudicial impact of the

array of all the errors raised, that it cannot be said that Hodges' trial met the exacting standards

of reliability required by the Constitution.  In *Manning v. State*, 726 So.2d 1152, 1198 (Miss.

1998) (capital murder convictions and death sentence affirmed), after addressing 21

assignments of error with sub-parts, and after making numerous findings of no "reversible

error," we stated:

> This Court has held that individual errors, not reversible in themselves, may combine with other errors to make up reversible error.  *Hansen v. State*, 592 So.2d 114, 142 (Miss. 1991);[2] *Griffin v. State*, 557 So.2d 542, 553 (Miss. 1990).  The question under these and other cases is whether the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial.  Where there is "no reversible error in any part, . . . there is no reversible error to the whole."  *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987).

---

[2]In *Hansen*, likewise a death penalty case, this Court found that the trial court had committed three errors during the guilt phase, but "we nonetheless hold the errors in this case, given their cumulative effect upon the penalty phase, harmless beyond a reasonable doubt." 592 So.2d at 153.

Additionally, this Court has held that a murder conviction or a death sentence will not warrant reversal where the cumulative effect of alleged errors, if any, was procedurally barred. ***Doss v. State***, 709 So.2d 369, 401 (Miss. 1996).

¶151. This Court holds that since there is no merit in any of Hodges' assignments of error and some of his alleged errors were procedurally barred, we refuse to reverse his conviction based upon cumulative error. Cumulatively, these asserted errors do not warrant reversal.

### 19. Proportionality Review

¶152. This Court must also review the death sentence in accordance with Miss. Code Ann. § 99-19-105(3) (Rev. 2000), which states:

> (3) With regard to the sentence, the court shall determine:
> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
> (b) Whether the evidence supports the jury's or the judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;
> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and
> (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error or both.

¶153. Under this analysis, there is no evidence supporting a finding that the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. As previously discussed, the evidence supports the trial court's finding that the statutory aggravating factors of burglary, kidnaping, avoiding or preventing a lawful arrest and under a sentence of imprisonment were proven beyond a reasonable doubt. Upon comparison to other factually similar cases where the death sentence was imposed (see Appendix A), the sentence of death

85

is not disproportionate in this case. Imposition of the death penalty on Hodges is neither excessive nor disproportionate in comparison to his crime. Furthermore, the sentence of death is not excessive or disproportionate to factually similar cases, despite the age of Hodges when the crime was committed. Having given individualized consideration to Hodges and the crime in the present case, this Court concludes that there is nothing about Hodges or his crime that would make the death penalty excessive or disproportionate in this case.

¶154. Furthermore, the United States Supreme Court, on March 1, 2005, handed down *Roper v. Simmons*, 543 U.S. ___, No. 03-633, slip op. at 25 (March 1, 2005), holding that the "Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." In the present case Hodges was born on October 14, 1980. Hodges committed capital murder in the early morning of July 21, 1999. Hodges was 18 years old when he committed the crime of capital murder of Isaac Johnson. Therefore, Hodges was not under the age of 18 when he committed the crime of capital murder, and *Roper* does not apply to this case. The imposition of the death penalty on Hodges does not violate the Eighth and Fourteenth Amendments.

### CONCLUSION

¶155. For these reasons, we affirm the judgment of the Lowndes County Circuit Court.

¶156. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED. COUNT II: CONVICTION OF KIDNAPPING AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**WALLER AND COBB, P.JJ., EASLEY, CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**

86

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State* 883 So.2d 20 (Miss. 2004)

*Branch v. State,* 882 So.2d 36 (Miss. 2004).

*Scott v. State,* 878 So.2d 933 (Miss. 2004).

*Lynch v. State,* 877 So.2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So.2d 140 (Miss. 2004).

*Byrom v. State,* 863 So.2d 836 (Miss. 2003).

*Howell v. State,* 860 So.2d 704 (Miss. 2003).

*Howard v. State,* 853 So.2d 781 (Miss. 2003).

*Walker v. State,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State*, 800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999).

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).      *remanded for *Batson* hearing.

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).


## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi***, 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State***, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi***, 494 U.S. 1075 (1990) vacating and remanding ***Pinkney v. State***, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

### DEATH CASES AFFIRMED BY THIS COURT
#### (continued)

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).
*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987)*, Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

iv

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

**DEATH CASES AFFIRMED BY THIS COURT**

**(continued)**

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE

*Flowers v. State,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

**DEATH CASES REVERSED AS TO GUILT PHASE
AND SENTENCE PHASE**
(**continued**)

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

**DEATH CASES REVERSED
AS TO PUNISHMENT AND REMANDED
FOR RESENTENCING TO LIFE IMPRISONMENT**

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# ON SENTENCING PHASE ONLY

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

## DEATH CASES REVERSED AS TO
## PUNISHMENT AND REMANDED FOR A NEW TRIAL
## ON SENTENCING PHASE ONLY
### (continued)

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 F. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.